### INSURANCE COMPANY *v.* RAILROAD COMPANY.

A contract between A., a despatch company, and B., a railroad company, whose road, in connection with those of other companies, forms a continuous line, stipulated that B. should "receive, load and unload, deliver and way-bill," all freight sent to it by A. at such rates for transportation as may be established by the railroad companies, and should, while assuming all the risks of a common carrier, pay for all damage to or loss of property while on its road or in its possession. A similar contract was entered in by A. with each of the other companies, between which there was an arrangement that the amount charged for the through freight should be divided between them according to the length of their respective roads; that each company should pay for losses occurring on its road; and that on such freight the last carrier should collect the charges from the consignee, deduct its share thereof, account in the same way to the next company, and so on to the first. Settlements were made by the railroad companies periodically upon accountings between them, and each settled separately with A. *Held*, 1. That B., by its agreement with A., incurred neither an obligation to carry freight beyond its own road nor a liability for the negligence of either of the other companies. 2. That the arrangement between the railroad companies did not make them partners *inter sese* or as to third persons.

ERROR to the Circuit Court of the United States for the Eastern District of Missouri.

The facts are stated in the opinion of the court.

*Mr. John G. Chandler* for the plaintiff in error.
*Mr. John G. Williams, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

The cotton, for the recovery of the value of which this action was brought against the St. Louis, Vandalia, Terre Haute, and Indianapolis Railroad Company, the defendant in error, was, at the time of shipment, owned by Adolphus Meir & Co., of St. Louis, who, for a valuable consideration, have assigned to the St. Louis Insurance Company, the plaintiff in error, all their claim on account of the said loss. The parties having, by proper written stipulation, waived a jury, the case was tried by the court, and judgment given for the railroad company.

The facts set forth in a special finding, covering many pages of the printed transcript, so far as they are deemed essential to a clear understanding of the case, are as follows: —

The Erie and Pacific Despatch Company, a Kansas corpora-tion, having agencies in different cities of the Union, and whose business it was to solicit and forward freights over trunk rail-road lines between St. Louis and New York, received the cotton in question from Meir & Co., under agreements for its transportation to Liverpool, for a through rate, expressed in English money. No direction was given as to the route over which it should be carried to the seaboard, nor were any bills of lading then executed.

The St. Louis Transfer Company, having received from the despatch company the warehouse receipts, and having been engaged by it for that purpose, hauled the cotton to East St. Louis, and there delivered it, on account of that company, to the defendant, taking receipts therefor. By the dray tick-ets of the transfer company the cotton was consigned by the despatch company to C. G. Meir & Co., London. The defendant had not, on previous occasions, issued bills of lading for freight shipped over its line by the despatch company, nor did it do so for any part of these shipments. But, in accordance with its custom, it made a way-bill for the cotton to Indianapolis. The cotton was carried safely over the defendant's road from East St. Louis to Indianapolis; thence, pursuant to directions of the despatch company, and without change of cars, over the Pittsburg, Cincinnati, and St. Louis Railroad to Urbana, Ohio, where it was put into other cars suitable to the change of gauge at that point; and thence over the Atlantic and Great Western Railroad and the Erie Railway to Jersey City.

The cotton was destroyed by an accidental fire which occurred in Jersey City on the 21st of March, 1873.

Within the usual time after the respective shipments from East St. Louis the despatch company executed and delivered to Meir & Co., of St. Louis, bills of lading for the cotton. Each bill disclosed the quantity of cotton, its destination, the names of the consignors and consignees, the agreed rates in English money, and purported to be the " Through bill of lading of the Erie and Pacific Despatch, and the Oceanic Steam Naviga-tion Co. from St. Louis to Liverpool, calling at Queenstown." With the last-named company, known as the White Star Line,

the despatch company had an arrangement by which it could contract for shipments from New York to Liverpool at rates given by the steamship line, the latter agreeing to receive the goods at its dock in Jersey City, and transport them to Liverpool. But the despatch company had no power to bind the steamship line for any risks incurred in the inland transportation, nor did it receive from the line any commission or other compensation. Its remuneration came exclusively from certain arrangements with railroad companies, to which we shall presently refer.

The bills of lading delivered to Meir & Co. contained, among other provisions, the following : —

" That the said Erie and Pacific Despatch and its connections which receive said property shall not be liable . . . for loss or damage by . . . fire . . . nor for damage to perishable property of any kind occasioned by delays from any cause ; . . . nor for loss or damage on any article of property whatever by fire or other casualty while in transit, or while in deposit or in places of transshipment or at depots or landings at all points of delivery. . . .

" It is further agreed that said Erie and Pacific Despatch and its connections shall not be held accountable for any damage or deficiency in packages after the same shall have been receipted for in good order by consignees, or their agents, at or by the next carrier beyond the point to which the bill of lading contracts. Consignees are to pay freight and charges upon the goods or merchandise in lots or parts of lots as they may be delivered to them.

" It is further stipulated and agreed, that in case of any loss, detriment, or damage done to, or sustained by any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment, or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods.

" And it is further agreed, that the amount of the loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of said goods or property at the place and time of shipment under this bill of lading.

" This contract is executed and accomplished, and the liability

of the Erie and Pacific Despatch as common carriers thereunder terminates, on the delivery of the goods or property to the steamship at White Star wharf, Jersey City, when the liability of the steamship company commences, and not before. .

\*     \*     \*     \*     \*     \*     \*

"NOTICE. — In accepting this bill of lading the shipper, or other agent of the owner of the property carried, expressly accepts and agrees to all its stipulations, exceptions, and conditions."

The right of recovery in this case against the defendant is rested by the plaintiff in error in part, if not altogether, upon certain business relations existing at and before the time of these shipments, as well between the despatch company and the railroad companies over whose lines the cotton was carried, as between the railroad companies themselves. It is necessary, therefore, to ascertain what were the precise relations held by these several corporations to each other.

During the period covered by these transactions, and for some time prior thereto, the Erie and Pacific Despatch Company had arrangements with sundry railroads having connections terminating in New York, under which it was empowered to contract for the transportation of goods according to the tariff rates, or any special rates furnished by the respective railroad companies. It had a separate agreement with each of the railroad companies already named, in some cases oral, in others written. The agreement with the Erie Railway Company was in writing, and, among other things, provided that the despatch company should establish and maintain, at its own expense, independent and efficient agencies for soliciting and procuring freight, in the cities of New York and Boston, and in other cities, east and west, as the parties might deem necessary; that the railway company should transport all through freight secured by the despatch company, either eastward or westward bound, passing between Philadelphia, New York, Jersey City, Albany, Boston, and common or competing points in New England, and common or competing points on the line of the Erie Railway, except that on east bound freight the despatch company should not receive any commission on shipments from any station on the line of that railway; that the despatch company should issue its own bills of lading to ship-

pers, subject, as to rates, to the current through rates of the railway company, which should at all times be as low as the rates furnished to any other party or parties; that the railway company should receive, load and unload, deliver and way-bill, and furnish daily an impression copy of each way-bill, of both eastward and westward bound freight, free of charge, to the despatch company; that the railway company agreed to assume " all the risks of common carriers, and to pay all damage to or loss of property while on their line of road or in their possession," and in case property was lost or damaged, and the loss and damage could not be definitely located, the railway company should pay said loss in proportion to what was received for transporting the same, subject, however, to the liability limitations contained in the bills of lading of the despatch company; that the railway company should transport all freight known as first-class freight on the fastest freight trains running over its road, and so run the same and all through freight trains so as to enable the despatch company to deliver freight between competing points, in the east or west, as quickly as it was done by any other competing line or road; that the despatch company should maintain the authorized rates of the railway company, and be governed, in the transportation of through business, by any obligations entered into by the railway company with their competing lines for the maintenance of rates; and that the railway company should give to the despatch company at all times as low rates as were given to any other line running over the road of the former, and would prorate any rate on east bound freight, made by authority of the road leading from the point, provided that road was authorized to make through rates over the Erie Railway; and that they would prorate all losses, damages, and rebates that were prorated with any other line running over that railway.

It was further stipulated in that agreement that, in consideration of the mutual benefits to be derived by the parties, the railway company should pay to the despatch company a commission on west bound freight of fifteen per cent of their gross earnings, as per their way-bills, on first, second, and third class freight, and ten per cent on their gross earnings, as per their way-bills, on fourth and special class freight from

certain points to certain other designated points. On East bound freight the despatch company was to receive from the railway company ten per cent of their gross earnings, as per their way-bills, on first, second, and third class freight, and eight per cent of their gross earnings, as per their way-bills, on fourth-class freight, from certain named places, and on freight from certain places, competing points on the Atlantic and Great Western Railroad, provided such freight originated from points off of said line ; it being understood that no commission should be paid on freight originating at such stations.

With the defendant the despatch company had a parol agreement, which was the same in substance as the written one with the Erie Railway Company. It had no power, however, to contract for or fix any rate on the carriage of goods over the road of the defendant, except as authorized by the latter.

In all cases of freight, ocean bound, from the West, over the Erie Railway, shipped by or consigned to the care of the despatch company, the latter was treated as the consignee in New York, and the freight was held subject to its order. The railway company was ready to deliver the Meir cotton as it arrived in Jersey City, and as directed by the despatch company.

What were the relations which the railroad companies sustained towards each other during the same period ? In the year 1873, and prior thereto, the companies owning or operating the various railroad trunk lines between St. Louis and New York had an arrangement between themselves, whereby the general freight agents of the roads terminating at St. Louis made what was called a joint tariff to New York, fixing through rates, which were divided among the several roads constituting a through line. According to an estimate of distances the goods were to be carried by each road upon the basis of the shortest line. Losses occurring on through shipments, if not located, were prorated as between the companies themselves, in the same ratio as the freight moneys ; but if located, were, as between the railroad companies, to be paid by the one on whose road the losses occurred. The joint tariff was published and put into the hands of railroad agents for their guidance in making contracts, and was also distributed to shippers and to the public generally. The titlepage of that tariff was : " Joint

rates of transportation from St. Louis *via* Toledo, Wabash, and Western; Ohio and Mississippi; Chicago and St. Louis; St. Louis, Vandalia, Terre Haute, and Indianapolis; Indianapolis and St. Louis; St. Louis and Southeastern; and St. Louis, Bellville, and Southern Illinois Railroads." In all cases when a through rate was contracted for, the several railroads of the connecting line participated therein according to the aforesaid arrangement for prorating through freights with each other. The railroad companies collected the freight from the consignees, divided it among themselves, and paid to the Erie and Pacific Despatch Company for its services so much per cent on the gross freights for pound freight, and sixty cents a bale on cotton, each road settling separately with that company for its dues.

It is further stated, in the special finding, that on all shipments from St. Louis to New York by the railroad companies over which the Meir cotton was carried, the defendant paid the transfer charges from St. Louis to East St. Louis, and the Erie Railway paid the lighterage at Jersey City, whether the goods were to go to New York proper, or were foreign bound. These transfer and lighterage charges were included in the through rate named by the defendant. On shipments by that route from New York to St. Louis the defendant collected the freight money from consignees, and, retaining its proportion, accounted for the residue to the next road in the line, which in like manner deducted its share and accounted in the same way to the next, and so on to the beginning of the line. On shipments from St. Louis to New York City proper the Erie Railway collected the freights from the consignees, and in like manner settled with the next preceding carrier, and so on, in the inverse order of the transportation, to the first carrier. These settlements between the roads were made periodically upon accountings between them. Upon shipments to foreign ports, the despatch company collected from the ocean steamer the full amount of the inland freight, and paid the same to the Erie Railway Company, which settled with the preceding carriers.

The general question presented by this case, as will have been observed, relates to the liability of the defendant in error for the value of certain cotton, part of shipments made in January and February, 1873, at St. Louis for Liverpool, and which

having passed over its road, thence over the lines of other railroad companies, was destroyed by an accidental fire in Jersey City, while in the custody of the Erie Railway Company for delivery to an ocean steamer for further transportation.

The positions taken on behalf of the plaintiff in error are in substance these : —

That the original contracts of transportation between Meir & Co. and the despatch company were in parol, became complete when the parol agreements were made, and, consequently, for the ascertainment of the rights of the parties, reference cannot be made to bills of lading subsequently issued ;

That in no event can Meir & Co. be held bound by the special conditions in the bills of lading, whereby not only the despatch company and its " connections " were relieved from liability for loss of the cotton by fire, but all legal responsibility was limited to that company in whose actual custody it was when a loss occurred ;

That the defendant, with the other companies, over whose roads the cotton passed, jointly formed a continuous and connected line, and constituted a partnership of common carriers for the route between St. Louis and Jersey City ;

That the despatch company, by virtue of its relations with the railroad companies, including the defendant, was the agent of that partnership of carriers, and of each constituent member thereof, in all contracts by it made for the transportation of freight over their line, and that the delivery to it of the cotton was, in law, a delivery to that line of carriers and to each company of which it was composed ;

That, consequently, the defendant was liable for the destruction of the cotton by fire while in the custody of the Erie Railway Company, one of the corporations alleged to constitute the partnership, — such liability to be determined not by the before-mentioned special conditions contained in the bills of lading, but by the general doctrines which obtain at common law, in reference to public carriers not operating under a special contract, limiting their liability ; and, lastly,

That the cotton was held for an unreasonable length of time in Jersey City, without delivery to the Oceanic Steam Transportation Company for further transportation ; in conse-

quence of which delay, it is contended, the cotton was lost by
the fire mentioned; in other words, had the cotton, after reach-
ing Jersey City, been promptly delivered to the ocean steamer,—
it would not have been within reach of the fire that destroyed
it.   It is not claimed that there was negligence in any other
respect.

The first question pressed upon our attention relates to the
bills of lading.   It appears from the special finding that, at the
time the cotton was delivered to the despatch company, there
was an understanding that bills of lading should be given to
Meir & Co.   The latter had been, prior to 1873, large shippers
of cotton by that company, and had received from it numerous
bills of lading.   Whether they contained any special conditions
whatever is not found.   Nor does it appear whether the bills
of lading for the shipments of 1873 were to contain special
conditions relieving the despatch company and its connections
from the duties and responsibilities, or any of them, annexed
by law to their employment, nor whether the bills for those
shipments were similar to those given in previous years.   So
far as disclosed by the finding, Meir & Co. when receiving the
bills in question were silent as to their provisions.   Neither
when they received the bills of lading issued prior to 1873, nor
those issued on the shipments in question, was attention called
to their provisions.   Nothing was said by the despatch com-
pany on either occasion, about special exemptions or exceptions
for the benefit of the carriers.   In fact Meir & Co., although
having abundant opportunity to do so, never read any of the
despatch company's bills of lading further than to see that they
correctly described the cotton and accurately stated the rate,
designation, and names of consignors and consignees.   They
were not aware, until after the loss complained of, that the
bills of lading contained the special provisions under examina-
tion.   And it is expressly stated in the special finding that
they never "assented to said special provisions."

If the bill of lading constituted, as the Circuit Court held
that it did, the contract of transportation with the owners of
the cotton, and if the defendant is to be regarded as one of the
"connections" of the despatch company, then, manifestly, the
law would be for the defendant; for the bills of lading ex-

pressly limit responsibility for loss or damage to that carrier in whose actual custody the cotton might be when lost or destroyed. But, as we have seen, the plaintiff contends that Meir & Co. were not bound by those special conditions, for the reason that the bills of lading were not delivered until after the cotton was surrendered to the despatch company for transportation, and because, also, it is expressly stated in the finding that they never assented to those special provisions.    Plaintiff insists that it is the settled doctrine of this court, as announced in *New Jersey Steam Navigation Co.* v. *Merchants' Bank* (6 How. 344), *Railroad Company* v. *Manufacturing Company* (16 Wall. 318), *York Company* v. *Central Railroad* (3 id. 107), and in other cases, that a common carrier cannot resort to implication or inference, founded on doubtful and conflicting evidence, or on the silence of the shipper when receiving either a bill of lading or a notice with special conditions annexed; that the carrier, in order to obtain exemption from any of the duties imposed upon it by law, must show an express stipulation, in parol or in writing, upon the part of the shipper, assenting to such exemption ; and that, in the nature of things, Meir & Co. cannot be held to have expressly stipulated for exemptions to which, the court finds, they never assented.

To this it is replied that Meir & Co. expressly stipulated for bills of lading to be given them, had abundant opportunity to examine all the provisions of those subsequently delivered, and did in fact read some portion of each one ; that their failure to read all the provisions was their own fault; and, since the bill of lading contains an express notice that "in accepting this bill of lading the shipper or other agent of the owner of the property carried expressly accepts and agrees to all its stipulations, exceptions, and conditions," the law will not now permit Meir & Co. to plead their own negligence, or to say that its provisions were not binding upon them.

Whether the one or the other of these positions is correct it is not necessary to determine, since there are other controlling questions, touching which there is entire unanimity in the court, and upon the determination of which our decision may rest.

Waiving, therefore, any expression of opinion as to whether,

upon the findings in this case, the bills of lading expressed the contract between Meir & Co. and the despatch company, or as to whether the railroad company can take shelter under the special provisions, to which reference has been made, and assuming, for the purposes of our decision, — as the plaintiff in error insists we must do, — that the defendant cannot claim the benefit of those provisions, we proceed to an examination of other grounds upon which it is sought to hold the defendant liable for the value of the cotton burned in Jersey City.

The main proposition advanced upon this branch of the case by the plaintiff's counsel is that, in these transactions, the despatch company was the agent of the defendant and of the other railroad companies over whose lines the cotton was carried. If by this is meant that the despatch company was an agent of the defendant, with general authority to bind the latter by contracts for transportation, it is sufficient to say that there is no justification in the findings for any such position. It nowhere appears that the despatch company assumed to have, or that the defendant recognized it as having, any such unlimited authority. The despatch company and the defendant had, it is true, certain business relations; but those relations did not necessarily involve an agency upon the part of the former for the latter in the making of contracts for transportation. The agreement between those companies only bound the railroad company to "receive, load and unload, deliver and way-bill," such freight as was sent to it by the despatch company; and at the rates established, not by the latter, but by the defendant and other railroad companies. The despatch company could not itself make a contract, or fix any rate for the carriage of goods over the defendant's road, except as authorized by the defendant. It is expressly so stated in the special finding. So far from the despatch company being authorized to impose upon the defendant obligations for the safe carriage of goods over the lines of other carriers, the agreement of the defendant with that company was, while assuming all the risks of common carriers, "to pay all damages to or loss of property, while on their line of road or in their possession." The contract obligation of the defendant to receive and trans-

port the freight of the despatch company, at the established rates, did not impose upon the former an obligation to carry beyond its terminus, or subject it to liability for the negligence of other carriers. Whether the defendant should undertake for the safe transportation of goods beyond its own line was not a matter left, in any degree, for the determination of the despatch company, and was not within any authority it had. The liability of the defendant for the safe carriage of the cotton, after its delivery to the next succeeding carrier on the prescribed route to New York, must, therefore, depend upon the inquiry whether the defendant, in any form, assumed, or held itself out to the public as assuming, any such responsibility. The legal proposition involved in this inquiry was considered by this court in *Railroad Company* v. *Manufacturing Company*, *supra*. Speaking by Mr. Justice Davis, we there gave our sanction to the rule, adopted in most of the courts of this country, that the carrier, in the absence of a special contract, express or implied, for the safe transportation of goods to their known destination, is only bound to carry safely to the end of its line, and there deliver to the next carrier in the route This principle was subsequently recognized in *Railroad Company* v. *Pratt* (22 Wall. 123), although in that case the waybill or receipt of the carrier was held to import an undertaking for the safe carriage of the goods as well over its own line as over the lines of other carriers. Was there, we then inquire, in the present case, a special contract or undertaking by the defendant to carry beyond its route? A careful consideration of the facts set out in the finding satisfies us that there was no such contract or undertaking. The defendant received the cotton without executing bills of lading therefor. It had never given bills of lading for goods shipped by the Erie and Pacific Despatch Company. Its custom was to make a way-bill only over its own road. That course was pursued in this case; and defendant only collected and received pay for carrying to Indianapolis. It is true the way-bills, upon their face, indicated that the cotton was consigned to C. G. Meir & Co., London. But that circumstance is not, of itself, controlling or conclusive. The reference in the way-bill to the consignees was mere description to show the ultimate destination of the

cotton. Each way-bill, executed by the defendant, purported to be nothing more than a "manifest of freight from St. Louis to Indianapolis," and fails to show an undertaking by it to transport beyond the latter city.

A special undertaking to carry beyond its terminus cannot be implied, against the defendant, from the arrangement already referred to, between the despatch company and sundry railroad companies whose lines terminated at New York, whereby the latter, separately, agreed to carry all goods for the transportation of which the former should contract, at the established tariff rates, or at any special rates furnished by the railroad companies.

Such an arrangement did not, in our opinion, involve joint liability upon the part of the railroad companies, or make them partners either *inter sese* or as to third persons. Each company bore the general expenses of its own route and of all transportation over it. The division, upon the basis merely of distance, of the aggregate pay for the entire route covered by the roads of these companies gave each one no greater amount than perhaps it would have earned had the despatch company contracted with each, separately, for the transportation of the cotton. The arrangement in question was one simply of convenience both for the shipper and carrier. Under it Meir & Co. were enabled to contract, at St. Louis, for a through rate for the transportation of the cotton by the despatch company. The latter, in order to meet its obligations to the owners of the cotton, used the road of the defendant, receiving from the latter nothing more than its way-bill to Indianapolis, which showed upon its face the proportion of the aggregate pay to which the defendant would be entitled. The defendant received compensation only for transportation over its road, and settled separately with the despatch company. It undertook, and was only bound, to transport over its own line and deliver to the succeeding carrier. That duty was discharged, and the loss occurred while the cotton was held by another carrier. The mere fact that it joined with other companies in establishing a through rate from St. Louis to New York, to be divided between themselves, upon the basis, not of expenses incurred, or investment made, but of distance simply, although compe-

tent as evidence, does not, of itself, imply an undertaking to transport beyond its line, or to become bound for any default or negligence of other carriers.

In view of the conclusion thus indicated, it is unnecessary to determine the rights of the plaintiff in error as against the despatch company, or to inquire whether the detention of the cotton in Jersey City, under the circumstances disclosed in the record, was negligence upon the part either of the despatch company or of the Erie Railway Company, or of both. Nor need we inquire whether the destruction of the cotton, by an accidental fire, was, in a legal sense, the result of its detention, in Jersey City, for an unreasonable length of time without delivery to the ocean steamship. Those questions are not material upon the present issues.

Upon the whole case the law is for the defendant.

*Judgment affirmed.*