## DEMING *v*. NORFOLK & W. R. Co.

*Circuit Court, E. D. Pennsylvania.* June, 1884.)

1. CARRIERS—THROUGH LINES—RESPECTIVE LIABILITY OF CONNECTING CARRIERS.
   Several connecting carriers, having entered into certain contract arrangements for continuous transportation on through bills of lading, at settled rates of compensation, providing that each line should be responsible alone for its acts or omissions, do not thereby become liable as partners for the undertakings, representations, or misconduct of the carrier who receives merchandise from a shipper.

2. SAME—DELIVERY—BLOCK IN THROUGH LINES—LOSS BY FIRE—NEGLIGENCE.
   Where cotton was delivered to a carrier to be transported from Memphis, Tennessee, to Woonsocket, Rhode Island, upon through bills of lading, exempting liability for fire, issued by the receiving carrier in pursuance of such arrangement between the connecting carriers, and the cotton was delayed at Norfolk by reason of a block caused by accumulation of freight on the line intended to convey it therefrom, and was stored in the defendant's warehouses, where it was burned, *held*, that the company so storing the cotton was not bound to send the cotton forward by other lines, and was not liable for the loss. The fact that the company had effected an insurance on the cotton is unimportant.

This was an action on the case by R. H. Deming & Co. against the Norfolk & Western Railroad Company, and was tried without a jury before the Hon. WILLIAM McKENNAN and WILLIAM BUTLER. The following facts were found:

*First.* The Norfolk & Western Railroad Company, the defendant, is a corporation owning and operating a line of railroad extending from Bristol, Tennessee, to Norfolk, Virginia. At Bristol it connects with the line of the East Tennessee, Virginia & Georgia Railroad Company, and at Roanoke, about 130 miles east of Bristol, with that of the Shenandoah Valley Railroad Company, which connects at Hagerstown with the Pennsylvania Railroad system. These companies have entered into certain contract arrangements for the conduct of through business, under the name of the Virginia, Tennessee & Georgia Air-line, but there is no other evidence in the case showing the terms of this contract than appears in the bills of lading and manifests, and the conduct of the parties as hereinafter stated.

*Second.* On October 11, 1883, the plaintiffs, R. H. Deming & Co., who are cotton buyers, shipped at Memphis, Tennessee, for Woonsocket, Rhode Island, two lots, one of 50 and the other of 100 bales, and on October 17, 1883, another lot of 100 bales. The shipment was made upon the Memphis & Charleston Railroad, and three full bills of lading, all similar in form. The material clauses of the bills of lading are as follows:

"MEMPHIS & CHARLESTON RAILROAD AND CONNECTIONS.

"(*East Tennessee, Virginia & Georgia Railroad Company, Lessee.*)

"OCTOBER, 1883.

"Received of A. B. the following packages, marked, etc., to be transported by the Memphis & Charleston Railroad, and connecting railway and steamship lines, to order, at Woonsocket, R. I., * * * upon the following conditions:

"(1) That the Memphis & Charleston Railroad, and the steam-boats, railroad companies, and forwarding lines with which it connects, and which receive said property, shall not be liable * * * for loss or damage on any article of property whatever by fire or other casualty while in transit, or

while in depots or other places of transhipment, or at depots or landings at points of shipment or delivery.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"(7) In consideration of the special rate named in margin, the shipper or agent of the owner of the property carried agrees to effect an insurance against loss or damage by fire while in transit, in deposit, or in places of transhipment, or at depots or landings at all points of delivery; and it is expressly agreed that the carrier shall be entitled to the benefit of any insurance effected covering any such risk, loss, damage, or detriment.

"(8) It is further stipulated and agreed that in case of any loss, detriment, or damage done to or sustained by any of the property here receipted for, during such transportation, whereby any legal liability or responsibility shall or may be incurred by the terms of this contract, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of said loss, detriment, or damage, and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods.

"This contract is executed and accomplished, and the liability of the companies as common carriers thereunder terminates, on the arrival of the goods or property at the station or depot to which this bill contracts, and the companies will be responsible as warehouseman only thereafter; and unless removed by consignee from the station or depots of delivery within twenty-four hours of their said arrival, they may be removed and stored by the companies at the owner's expense and risk.

"NOTICE. In accepting this bill of lading, the shipper or the agent of the property carried expressly agrees to all stipulations, exceptions, and conditions.

"In witness whereof, the agent hath affirmed to ——— bills of lading, all of this tenor and date, one of which being accomplished, the others to stand void.            "——— ———, Agent."

*Third.* The route over which the cotton was to be carried, as fully understood by the plaintiffs, was by the Memphis & Charleston road to Chattanooga; thence by the East Tennessee, Virginia & Georgia Railroad to Bristol; thence by the Norfolk & Western Railroad to Norfolk; thence by the steamers of the Merchants' & Miners' Steam-ship Company to Providence. Manifests or way-bills, which are *memoranda* sent by the first carrier with each car containing instructions to the succeeding carriers for the transhipment and final delivery of the freight, accompanied each shipment, giving the directions under which the cotton was to be transported and transferred from one carrier to the other. The through freight was 74 and 78 cents per hundred pounds, which was less than one-half the sum which would have been charged had the cotton been shipped and reshipped over each of the connecting lines. The plaintiffs had made other shipments by the same route, and knew the line of steamers by which the cotton was to be carried from Norfolk to Providence. The time occupied in transport between Bristol and Norfolk by railroad is 48 hours, and from Roanoke to Norfolk is 36 hours. The usual delay in transhipment at Norfolk was two days. In ordinary course of transportation cotton reaches Providence in 14 to 18 days from Memphis, and it was the usual course of dealing of the plaintiffs to send out tracers if the cotton did not arrive within 20 days from the time of shipment.

*Fourth.* The Merchants' & Miners' Transportation Company run two lines from Norfolk,—one to Boston and one to Providence,—and prorate with the Virginia, Tennessee & Georgia Air-line upon all freight received from over that line; and, by an understanding between the steam-ship companies running steamers from Norfolk, is the only line that carries freight to points

east of the Connecticut river. Under the same understanding, the Old Dominion Steam-ship Company, running to New York, was to receive all freight to points west of the Connecticut river, and the Baltimore Steam Packet Company for Philadelphia, in connection with the Philadelphia, Wilmington & Baltimore Railroad. Upon the Providence line there were four steamers, making tri-weekly trips, which were of sufficient capacity to carry the freight that usually offered.

*Fifth.* Upon the fifteenth of October the transportation company was unable to accept 500 bales of cotton till the next day, on account of accumulations of freight which had grown gradually from early in the month. Between the fifteenth and twenty-third of October there had been communication between the officers of the two companies in reference to the forwarding of the increased quantities of freight that were in transit. The Norfolk agent of the steam-ship company visited Baltimore, Philadelphia, and New York to charter other steamers, and chartered the only steamer which he had succeeded in finding. This steamer arrived at Norfok on October 28th. The president of the steam-ship company also promised to transfer in a few days one of its Savannah steamers to the Providence line to accommodate the unusual influx of business; and in order to increase the number of trips between Norfolk and Providence, temporarily stopped running up to Baltimore, which was on the route. In the fall of the year all lines of transportation from the south to the north are commonly more or less crowded, but the pressure in October and November, 1883, was unusually great upon all lines. When the first shipment arrived on the twenty-third of October, an extra steamer was expected in a few days. About 12,000 bales of cotton had accumulated on the wharves and warehouses of the steam-ship company, and when the first shipment of the cotton in question arrived upon the twenty-third of October, and the agent of the railroad company tendered delivery in due course, no more could be conveniently stored at that point, and the agent of the steam-ship company declined to accept it, upon the ground that he had no place to store it, but proposed that if the railroad company would unload and store in its own warehouse and on its wharf about 2,000 bales of cotton, he would pay for insurance upon it and send a steamer in a few days to remove it. The wharf is the regular terminus of the railroad of the defendant in the city of Norfolk, and equally accessible as that of the steam-ship company to steamers. In view of the declared and actually existing impossibility of its receipt by the transportation company, and in reliance upon the assurance from the officers of the steam-ship company that an additional steamer would be forwarded to remove the cotton within a few days, the superintendent of the railroad company authorized the Norfolk agent to unload the cotton and effect an insurance of $100,000 in the name of "The Norfolk & Western Railroad Company, and for account of whom it may concern." On October 26th about 1,000 bales additional arrived, making 3,028 bales in all, and were unloaded under the same agreement, and $40,000 additional insurance was effected. The premiums were paid by the steam-ship company.

The exact dates of the arrival of the cotton were as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1883, October 22, | - | - | - | - | - | - | 61 | bales. |
| 23, | - | - | - | - | - | - | 826 | " |
| 24, | - | - | - | - | - | - | 352 | " |
| 25, | - | - | - | - | - | - | 842 | " |
| 26, | - | - | - | - | - | - | 714 | " |
| 27, | - | - | - | - | - | - | 103 | " |
| 31, | - | - | - | - | - | - | 107 | " |
| Date of arrival not given, | - | - | - | - | - | - | 23 | " |

3,028 bales.

The cotton thus stored on the defendant's wharf and in the warehouse was cotton destined for Providence, and was selected by the steam-ship company for unloading at the wharf for this reason. No increased risk of fire arose from placing the cotton on the wharf and in the store-house, as was done. It was the custom of each company to insure merchandise in its custody, and like insurance would have been taken out if the cotton had been stored at the steam-ship wharf. From day to day repeated assurances were given that a steamer would be sent, and the extra vessel, which arrived on October 28th, had been promised for the removal of this cotton, but was loaded at the other wharf, because of some difficulty in reference to the coaling or loading; and the Berkshire, a vessel capable of carrying about 5,000 bales of cotton, was transferred from the Savannah line to Norfolk, and she was expected to reach there on the thirteenth of November, but did not do so until the night of the fourteenth of November, having been delayed at Boston or on her way. On the morning of the fourteenth of November a fire occurred which destroyed the larger part of the cotton. None of the 3,028 bales could be identified, and the loose cotton saved was sold under the direction of the fire underwriters, and the proceeds deposited in bank for the benefit of whom it might concern. The value of the plaintiff's cotton which was burned was $9,121.87. No notice was given to the plaintiffs of the storage and detention of the cotton, and it does not appear from the evidence that tracers were sent out or inquiry made by the plaintiffs. Notice of the loss of their cotton was given to the plaintiffs in Providence by letter dated Norfolk, November 27th, which was the first knowledge the plaintiffs had of their loss. No notice was given to the plaintiffs of the sale of the remnants of the cotton saved from the fire. The cotton burned had been sold by the plaintiffs to the mills for consumption. In addition to the 3,028 bales already mentioned, another lot of cotton, amounting to 1,000 bales, insured in the name of the steam-ship company, was stored in the same warehouse, and was also burned, making about 4,000 bales in all.

*Sixth.* After October 26th, and up to the time of the fire, freight continued to be received at Bristol, and other cotton at the rate of about 800 bales a day arrived by the Norfolk & Western Railroad, and was delivered to the steam-ship company, and large shipments were made from the steam-ship wharf to Boston and Providence; but it does not clearly appear that any cotton reaching Norfolk after October 26th had been shipped before November 14th. This fact is left in doubt by the testimony; but it is shown that no considerable quantity went forward, and no intentional preference was given. If the steamer which arrived on October 28th had been sent as promised by the steam-ship company to the railroad wharf, the plaintiffs' cotton would have been forwarded on that or the following day.

*Seventh.* Cotton could be forwarded by sail from Norfolk to Providence, but no cotton has been shipped coastwise by sail from that port for the last 10 years. Schooners that had been employed in other trades were seeking freights in Philadelphia and New York. A steam-ship, the Juniata, with a capacity of 2,500 bales, could have been chartered at Philadelphia on and after November 7th. This fact was not known to the defendant or to the agent of the steam-ship company, nor was the vessel advertised for charter or put in the hands of brokers. The Juniata had previously been moving cotton between Savannah and New York. No attempt was made to forward by the Shenandoah Valley Railroad via Roanoke. Cotton is sent to New England points from the south-west by this line, but a block existed there, which lasted from July until nearly Christmas; and the arrangements for transferring cars, necessitated by a change of gauge at that point, were not completed until February, 1884. The bulk of cotton, however, goes forward via Norfolk, that being a cheaper and more convenient route. No attempt was made to forward by the Canton line to Baltimore, and thence to destination by rail, it be-

ing known to the agent of the steam-ship company that its line was also running full, and upon application it did decline to charter one of its steamers. The Merchants' & Miners' Company offered the cotton for transportation to the Old Dominion Steam-ship Company. That line was also crowded, and the cotton was refused. In other respects the Merchants' & Miners' Company confined its efforts to chartering additional steamers, as already stated. It does not appear that the railroad company itself made any efforts to secure other transportation to Providence after the refusal of the Merchants' & Miners' Company to accept, but relied upon the assurances of the officers and agents of the steam-ship company that vessels would be supplied in a few days.

*Eighth.* The plaintiffs held an open policy of insurance in the Phœnix Insurance Company of Brooklyn, covering the entire transit from Memphis to Woonsocket, as follows:

"By the Phœnix Insurance Company, R. H. Deming & Co., on account of themselves, and to cover all cotton consigned to them by invoice and bill of lading, in case of loss to be paid in funds current in the city of New York, to them or order, do make insurance and cause to be insured, lost or not lost, at or from any seaport or inland town in the United States, direct or via port or ports to Boston, New York, Providence, and mills in the New England states. The fire shall be covered by this policy for not exceeding ten days prior to shipment, and for not exceeding ten days after arrival and discharge at port or place of destination, without additional charge of premium therefor. On cotton and other merchandise, each ten bales subject to separate average. To cover all cotton, whether consigned to them or to other parties in which the said R. H. Deming & Co. have an interest. To attach to all shipments, whether indorsed or not, but notice to be given this company as soon as known to the assured. This policy to attach as soon as the property is at the risk of the owner. Either party at liberty to cancel on giving ten days' written notice, but not to prejudice any risk then pending. Sum insured, $500,000, upon all kinds of lawful goods and merchandise, laden or to be laden on board the good vessel or vessels or conveyances. To attach to all shipments made on and after this date. Insured for cost and ten per cent. unless otherwise agreed upon at time of indorsement. Also to cover such other shipments as may be approved and indorsed by this company. Premiums to be settled monthly."

*Morton P. Henry* and *R. C. McMurtrie,* for plaintiffs.

The carrier who accepts goods to be carried beyond his own line for a through rate is bound to have transportation ready at the terminus of his line. *Bussey* v. *Memphis & L. R. R. Co.* 13 Fed. Rep. 330; *Railroad* v. *Manuf'g Co.* 16 Wall. 318; *Great Western R. Co.* v. *Burns,* 60 Ill. 284. The carrier is liable upon deviation from contract. *Maghee* v. *C. & A. R. Co.* 45 N. Y. 514; *Falvey* v. *Northern Transp. Co.* 15 Wis. 129; *Cassilay* v. *Young,* 4 B. Mon. 265; *Merchants' Ins. Co.* v. *Algeo,* 32 Pa. St. 330; *Davis* v. *Garrett,* 6 Bing. 716; *Hand* v. *Baynes,* 4 Whart. 201; *Robinson* v. *Merchants' Dispatch Co.* 45 Iowa, 472. The burden is upon carrier to show excuse. *Falvey* v. *Northern Transp. Co., supra; Bussey* v. *Memphis & L. R. R. Co., supra.*

*Samuel Dixon* and *Wm. Allen Butler,* for defendant.

Connecting carriers are not liable for the capacity of each succeeding carrier to immediately receive all goods which may be tendered. *Ins. Co.* v. *Railroad Co.* 104 U. S. 146; 3 Amer. & Eng. Ry. Cas.

271; *Myrick* v. *Railroad Co.* 107 U. S. 102; S. C. 1 Sup. Ct. Rep. 425; *Helliwell* v. *Grand Trunk Ry. Co.* 7 FED. REP. 68. If liable at all, the measure of damages would be the depreciation or loss of market value resulting from the delay, and no such loss is shown. *Railroad* v. *Reeves,* 10 Wall. 176.

BUTLER, J. What were the defendant's obligations? Did it discharge them? The answer to the first question involves the relations of the parties, as shipper and carrier. Did these relations spring from the express contract, entered into on receipt of the merchandise at Memphis, or an implied contract, arising from its receipt in transit at Bristol. The defendant was not a party to the bill of lading, nor responsible for anything done or omitted, when the merchandise was received at Memphis. The agreement between the several railroad companies did not make them partners, nor responsible in any respect for each other's acts or contracts. They were connecting carriers on a through route, each having the exclusive ownership and control of its line, with arrangements for continuous transportation on through bills of lading, at settled rates of compensation, each being alone responsible for its own acts or omissions, as specified in the bill before us. That such agreements do not render intermediate carriers responsible for the undertakings, representations, or misconduct of the carrier who receives merchandise from a shipper, seems to be so fully settled by the authorities as to leave nothing for discussion. It was the point directly involved and decided in *Ins. Co.* v. *Railroad Co.* 104 U. S. 146.

The defendant's obligations were, therefore, those of an intermediate carrier, arising out of the implied contract springing from receipt of the goods. These bound it for safe carriage over its own line, and for delivery or tender to the next carrier beyond, within reasonable time. *Ins. Co.* v. *Railroad Co.,* supra; *Empire Co.* v. *Wallace,* 18 P. F. Smith, 302; *Myrick* v. *Railroad Co.* 107 U. S. 102; S. C. 1 Sup. Ct. Rep. 425; *Railroad Co.* v. *Manuf'g Co.* 16 Wall. 318; Amer. & Eng. Ry. Cas. 271. It was entitled to the benefit of all exemptions allowed by the shipper, and bound to the terms of the bill of lading generally, as respects freight, etc. Being prepared to carry the merchandise, on its arrival at Bristol, it was the defendant's right as well as duty to accept it without inquiry. Had it not been so prepared, the acceptance would have rendered it responsible as carrier while the merchandise remained in its possession, no matter how great the delay arising from this cause might have been. The defendant was not, however, responsible for the succeeding carrier's failure to accept or provide means for further transportation. If the Memphis & Charleston Railroad Company, when it received the merchandise, was aware of the deficient means of transportation from Norfolk, (and that delay must consequently arise,) and failed to communicate this fact to the shipper, we may assume that this company was in fault. To visit the defendant, however, with responsibility for such fault, it

must appear that the latter is responsible for the former company's acts, and we have found it was not. If knowledge of this fault would entail responsibility on the defendant through acceptance of the merchandise, such knowledge could not be inferred from anything shown. The defendant, as before stated, was bound to no inquiry, and had (so far as appears) no information on this subject. It is unimportant that the defendant knew of the embarrassments at Norfolk when it received the merchandise at Bristol. Being then in transit the defendant's duty bound it to such reception. No probable benefit could arise to the shipper from refusing. In view of existing circumstances, a refusal might have entailed serious responsibilities.

The cases relied upon by the plaintiff (*Railroad Co.* v. *Manuf'y Co.* 16 Wall. 318, and *Bussey* v. *Railroad Co.* 13 FED. REP. 330) are inapplicable. The obligations involved were those of carriers receiving merchandise from the shipper, and either undertaking to provide means of carriage throughout,—as in the latter case,—or failing to communicate knowledge (which they had) of obstacles in the way of transportation,—as in the former. The responsibility arose in the one case, out of the express undertaking, and in the other, out of the bad faith.

Such being the defendant's obligations, did it discharge them? It carried the merchandise safely and expeditiously to Norfolk. When the first consignment arrived on the twenty-third of October, it was tendered to the Merchants' & Miners' Steam-ship Company, and was refused on account of accumulation of freight on its wharves; with the request or proposal, however, to place it and subsequent consignments on the wharf and in the warehouse of the defendant, (a place as convenient for loading into the steam-boat company's vessels as on its own wharves,) and with assurance that vessels would speedily be provided and sent there for it. This request was complied with, under a reasonable expectation that the steam-ship company would load and forward the cotton without unreasonable delay. Placing the subsequent consignment as proposed was a substantial tender. The designation of this place for loading was a virtual designation of the place for tender. To hold that the defendant should have hauled the cotton which arrived on the 26th to the steam-ship company's wharves, in view of what had occurred, would be unreasonable and unjust. The fact that insurance was procured is unimportant. Should the defendant have done more? In view of the facts it was not required to forward by any other route, nor would it have been justified in doing so. The steam-ship company was the carrier contemplated by the plaintiff. Indeed, it must be regarded as having been designated by him. If not on shipment at Memphis, it certainly was on delivery to the defendant. Those so delivering represented the plaintiff. That a preceding carrier represents the shipper in forwarding by his successor on a through line (under ordinary circumstances) is settled. The plaintiff's insurance would have been

jeoparded by the substitution of any other route. Besides this, as already stated, the defendant was fully justified in believing that the merchandise would be accepted and carried within a reasonable time by the steam-ship company, and would reach its destination more expeditiously by this route than any other. But for unforeseen circumstances, which could not be anticipated, this expectation would have been realized. Furthermore, it can hardly be said that there was any other practically available route. The defendant was not, therefore, in fault.

It must not be overlooked that the question here is not (as in *Railroad Co.* v. *Manuf'g Co.* 16 Wall. 318) whether the defendant remained liable under his obligations *as carrier* to the date of loss, but whether he was guilty of *willful fault,* and consequently forfeited the exemptions in the bill of lading, and thus became responsible for the consequences of the fire. That he was not guilty of such fault seems reasonably clear.

Judgment must therefore be entered for the defendant.

McKennan, J., concurring.