### AMERICAN ALLIANCE INS. CO. v. BRADY TRANSFER & STORAGE CO.

#### No. 11186.

Circuit Court of Appeals, Eighth Circuit. Jan. 27, 1939.

As Amended March 22, 1939.

transportation operations of the assured and applied to shipments "while in the custody and control of the assured, while in or on docks * * * depots, stations and/or platforms during due course of transfer to other insured trucks for distribution, from time of leaving warehouse, store, residence or factory of shipper or place of pickup until safely delivered to warehouse, residence or factory of consignee or place of delivery, whichever shall first occur, but this policy shall cover only while goods are actually in transit, and in no event shall this policy cover any goods after same have ceased to be at the risk of the assured." The insurance company's liability was limited to $7,500 for loss upon any one truck, and to $25,000 for loss arising out of one disaster.

Defendant pleaded a general denial and as affirmative defenses alleged that there was other insurance carried on the goods, rendering the policy inoperative except as to the excess; that the goods were not in the custody and control of the plaintiff when destroyed; that specific coverage had been contracted for by a rider on the policy at the terminal where the goods were destroyed, but that this had been cancelled because the terminal carried insurance on the goods.

The property for the destruction of which by fire this action was brought, was located, at the time of the fire, at a freight depot in Des Moines, referred to as the Motor Freight Terminal, operated by one Hermann. This freight depot caught fire July 15, 1936 and burned to the ground, totally destroying its contents.

The case was tried to the court without a jury, and the court made findings of fact and entered conclusions of law resolving all issues in favor of the plaintiff, and entered judgment thereon in favor of the plaintiff for $3,998.59, from which defendant prosecutes this appeal.

Defendant seeks reversal on the following grounds: (1) Other insurance carried on the goods rendered defendant's policy inoperative except as to the excess, if any; (2) the goods were not in the custody and control of the plaintiff, and hence, not covered by the policy; (3) there was no proof of value as to certain shipments; (4) the court erred in reforming the policy.

So far as defendant's contentions are dependent upon facts, it is confronted with the rule that the findings of the court are

Robert J. Bannister, of Des Moines, Iowa (Harley H. Stipp, Thomas M. Bannister, and Stipp, Perry, Bannister & Starzinger, all of Des Moines, Iowa, and Maher & Mullen, of Fort Dodge, Iowa, on the brief), for appellant.

Alan Loth, of Fort Dodge, Iowa, for appellee.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

Appellee, as plaintiff, brought this action against appellant to recover damages for loss of property by fire, which it is alleged was within the coverage of an insurance policy issued by appellant. It will be convenient to refer to the parties as they were designated in the lower court.

Plaintiff was, at all times pertinent to this action, a common carrier of freight by truck, and the policy issued by the defendant was by its express terms in compliance with the provisions of the Iowa Code (Section 5105a-26), requiring such carrier to file with the Board of Railroad Commissioners of Iowa a policy against "loss of or damage to property resulting from the operation of such motor carrier and for which such motor carrier would be legally liable." The policy covered all

presumed to be correct and will not be disturbed if supported by substantial evidence. Grouf v. State National Bank of St. Louis, 8 Cir., 76 F.2d 726; Pulitzer Publishing Co. v. Current News Features, 8 Cir., 94 F.2d 682; Wellston Trust Co. v. Snyder, 8 Cir., 87 F.2d 44.

Hermann, referred to in the record as Motor Freight Terminal, carried fire insurance in the sum of $5,000.00 issued by the Western Motor Fire Insurance Company "on merchandise of all kinds, property of assured and for which assured may be legally liable," while contained in the terminal building. The policy here in suit contains the following provision: "Other insurance permitted without notice until required and it is hereby declared and agreed that whenever any of the foregoing described property at the time of any loss is covered by specific insurance in this or any other office, this policy shall not extend to cover the same, excepting only as far as relates to any excess of value beyond the amount of such specific insurance, which said excess only is declared to be under the protection of this policy. Where there is other floating insurance, valid or not valid, on the same property, this policy shall be liable for no greater proportion than the sum hereby insured in one casualty, bears to the total floating insurance."

Defendant contends that, by reason of this provision, it is not liable, but that the liability is that of the insurance company issuing the policy covering the liability of Hermann. Defendant's argument presupposes that the goods were in the possession and control of Hermann and that he was legally liable to the shippers. There was no separate insurance on these goods, and the court has found as a fact that they were not in the possession of Hermann at the time of their destruction by fire, but that they were in plaintiff's possession. If not in Hermann's possession, he could not have recovered under his policy.

■■ Prohibitions against other or double insurance apply to insurance on the same interest in the same property. Collins v. Iowa Mfrs.' Ins. Co., 184 Iowa 747, 169 N.W. 199; California Ins. Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730. From the above quoted provision, it appears that permission to obtain other insurance was granted. This permission could not well have applied to any person other than the assured in the policy in question. It would seem to have been quite unnecessary to give other persons permission in plaintiff's policy to procure insurance to protect their interests. The term "other insurance" must, we think, be construed to apply to other insurance by the insured. Any doubt or ambiguity that might exist in this regard must be resolved against the insurer and in favor of the insured. The attempt by construction to limit the liability of the insurer on a policy of this character would violate the provisions of the Iowa statute pertaining to the carrying of insurance by motor vehicle carriers, as construed by the Supreme Court of that state.

■■ Section 5105a-26 of the Iowa Code of 1931 provides that the "insurance policy * * * shall bind the obligors thereunder to make compensation for * * * loss of or damage to property resulting from the operation of such motor carrier and for which such motor carrier would be legally liable." This statute was in effect written into the policy issued to the plaintiff by the defendant. A policy is contemplated as broad in coverage as the liability to be insured. Its purpose fundamentally is protection to the shipper. The shipper is not required to ascertain whether he is protected by the insurance of his carrier in possession, or by insurance of some other person who in the course of the transportation may handle his property. The statutory liability controls and is not to be lessened by contractual devices. Schmid v. Automobile Underwriters, 215 Iowa 170, 244 N.W. 729, 85 A.L.R. 4; Curtis v. Michaelson, 206 Iowa 111, 219 N.W. 49; Crozier v. Hawkeye Stages, 209 Iowa 313, 228 N.W. 320; Schisel v. Marvill, 198 Iowa 725, 197 N.W. 662. It was the manifest intent of the Iowa statute that the policy filed should obligate the insurer to pay for all loss or damage to property resulting from the operation of the motor carrier for which the motor carrier would be legally liable.

The contention that the goods were not in the custody and control of the plaintiff necessitates a study of the evidence. As has been observed, the court found that all the goods were in the custody and control of the insured at the time of the fire. The court found that the terminal "let to plaintiff and assigned to its use a (described) space in * * * the terminal building; plaintiff to employ and

obtain its own agent in charge of said space." This property may be divided into four general classes: (1st) shipments for delivery in Des Moines, found by the court to have been of the value of $490.-31; (2nd) shipments bound through Des Moines, which, aside from a shipment designated as the Kessler shipment, the court found to have been of the value of $232.32; (3rd) outbound shipments picked up in Des Moines by Hermann, which the court found to have been of the value of $2105.88; (4th) outbound shipments brought to the terminal by shippers for transportation over the defendant's line, found by the court to have been of the value of $275.08.

The evidence tended to show, and the court found, that the Motor Freight Terminal was used by the plaintiff as an agency in picking up and delivering shipments in Des Moines for it, and placing those goods in the space in the terminal which was assigned to plaintiff and which is referred to as the "Brady Dock," and that this space and the goods there stored were in the custody and control, and under the exclusive direction of one Cavanaugh, an agent of the plaintiff. These goods were transported by plaintiff under its bills of lading and its tariffs which required it to make delivery to consignees in Des Moines. Referring to this class of shipments, Hermann testified: "As to goods we were to deliver in Des Moines, Brady unloaded them in his space and they stayed there until our men were ready to take them away, and when our men took them away, Brady got a receipt for them."

The witness Cavanaugh, in his testimony, said: "Anything that would come in later in the day, if the floor was congested, it had to wait until the following morning. When a shipment would come in on a truck to be delivered in Des Moines, the checking in of the shipment is up to both the receiving man and the man on the truck. Lots of times I would check them myself, in the morning. * * * When Brady's trucks would drive up to those docks, he unloaded his freight there. The Motor Freight delivered the shipments that were to be delivered in the City of Des Moines, the smaller shipments anyway. They had a man there to see that they got it, and Brady also had a man there to see that he wasn't short. Lots of times it wasn't even checked over to the Motor Freight until they had a

man there that could come and get it in the morning. As a rule, they came and got it, signed for it as they received it, took it to their pickup trucks, and delivered it. Until they signed for it, it stayed in our end with our goods. Until it was signed for, Brady had it kept in his own hands. * * * This fire happened in the busy part of the day. About the busiest part of the day there was. There were goods on our space that had been brought there by Brady's trucks for delivery in Des Moines or other disposition. * * * I was in charge of those goods until the Motor Freight's men did come to get them and load them on their trucks."

Another witness for the plaintiff testified that their trucks would go directly to their area and unload these shipments and they would remain there until Hermann's trucks came to pick them up for delivery in Des Moines, and until Hermann's men were ready to put them on Hermann's trucks, they didn't have anything to do with them. There was other evidence as to the possession of the plaintiff, and we think the court's finding as to the possession of plaintiff of this class of property is sustained by substantial evidence.

Among the shipments bound through Des Moines was one referred to in the record as the Kessler shipment, which had been transported by plaintiff under its bill of lading issued at Fort Dodge, Iowa, and unloaded in plaintiff's space in the terminal, where it remained awaiting the call of a connecting carrier to take it on to Grand Island, Nebraska. As to this shipment, Kessler sued plaintiff and obtained judgment for $895, which plaintiff paid. As we understand it, the appellant concedes liability as to this shipment, and we shall pass it without further consideration.

There were other goods in this class of the value of $232.32. It is contended that as to these goods there was no substantial evidence that they were in the possession of the plaintiff at the time of the fire. These goods were transported by the plaintiff and were delivered at the terminal which was destroyed by fire. The question is whether they were in possession of the plaintiff at that time. As to this class of goods, Mr. Cavanaugh, testifying for the plaintiff, said: "I do not

know whether any of these shipments that were bound through Des Moines, that another carrier was supposed to take at Des Moines, had been signed for by the Motor Freight Terminal, or had been taken off of our space by the Motor Freight Terminal on the day of the fire."

He also testified: "The regular and usual method of handling freight coming into Des Moines into the terminal, was for the Motor Freight Terminal man to receive it at the tail gate of the truck and to check it off. That was the usual way. They were supposed to take it at the tail gate, and their truckers and their force of men handled the incoming freight from the tail gate of our truck, to whatever location in the terminal it should be placed in. But Brady's men did handle some incoming freight farther than the tail gate of the incoming truck."

The witness also testified as to this class of property that when it was received at the tail gate of the incoming truck by the Motor Freight Terminal, as was the custom, it would not be moved into the space of the plaintiff if the connecting carrier were ready to receive it, but the goods would be moved directly to the space or dock of the outgoing carrier.

■ The burden of proof as to the custody and control of these shipments was, of course, upon the plaintiff. The shipments were not interstate shipments, and there is no claim that the Carmack Amendment, 49 U.S.C.A. § 20(11), rendering the initial carrier of freight by railroad liable, was applicable. Under the common law, the initial carrier was liable only for the loss occurring on its own line. St. Louis Ins. Co. v. St. Louis, etc., R. Co., 104 U.S. 146, 26 L.Ed. 679; Myrick v. Michigan Central R. Co., 107 U.S. 102, 1 S.Ct. 425, 27 L.Ed. 325. In addition to this, the bills of lading state that the carrier agrees to carry the property to its usual place of delivery at the destination "if on its own railroad * * * otherwise to deliver to another carrier on the route to said destination." Plaintiff's witness frankly says that he did not know whether the shipments were on the dock or space assigned to the plaintiff at the terminal or not, and the testimony with reference to the general practice leaves it very doubtful, bordering on the realm of speculation and conjecture. It seems quite as probable that these shipments had

been delivered to the connecting carrier, or other terminal as the agent of the connecting carrier, as that they were placed in the space in the terminal assigned to the plaintiff, and hence, in its possession. Plaintiff seeks to invoke the doctrine of presumption of continuance of possession in the plaintiff, that having been once shown. In face of the undisputed testimony as to the practice and usage in handling such shipments, however, this presumption can not be invoked. A presumption of fact is not evidence, and ceases upon the introduction of substantial proof to the contrary. New York Life Ins. Co. v. Gamer, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218. As to these shipments, aggregating in value $232.32, we think the finding of the court is not sustained by substantial evidence.

■ As to the outgoing shipments picked up at Des Moines by Hermann, there was substantial evidence that they were brought to the terminal to be transported by plaintiff and had been delivered into the custody of Mr. Cavanaugh, plaintiff's agent, before the fire. True, receipts had not yet been signed by Cavanaugh, but that detail had no necessary connection with the actual reception of the property by Cavanaugh. Some of these shipments were brought directly to the terminal by the shippers for transportation by plaintiff. The court found that possession was in plaintiff, and that finding, being supported by substantial evidence, must be sustained.

The court found that the outbound shipments brought to the terminal by shippers for transportation over plaintiff's line had been delivered to and were in possession of the plaintiff at the time of the fire. They were delivered to Cavanaugh and placed on the plaintiff's dock or space when the shippers brought them. There was substantial evidence supporting the court's finding, and it must therefore be sustained.

■ It is contended by appellant that there was no competent evidence establishing the value of shipments of Olive Pearl Ritter, amount $201.16, H. Harris Company, amount $228.50, and General Electric Company, amount $123.50. The question is raised by request for special findings and exceptions to special findings of the court. The admissibility of the evidence offered was challenged by

proper objections, although the ruling on these objections is not presented in appellant's specifications of error. No witness testified as to any knowledge of the contents of either of these shipments. The only proof offered as to the Olive Pearl Ritter claim was in the nature of an unverified statement of the claim itself. The proof offered in support of the Harris Company claim was an invoice unidentified except through the testimony of a Mr. Jones that the invoice had been sent to him by the transfer company. He did not know that the goods listed on the invoice were actually contained in the shipment, nor did he claim to have any knowledge of the value of any of the goods. The proof offered in support of the General Electric claim was an invoice from that company to the Electrical Engineering and Construction Company. No one testified as to the value of the goods, that the invoice was correct, nor that the goods were actually shipped as shown by the invoice. Neither had any of these claims been paid by plaintiff. Plaintiff claims that the answer does not put the value of the property in issue. The answer admitted the destruction of the goods, "the value of which is sued for." A stipulation was made at the trial admitting the value set forth in the schedule attached to the substituted petition of the plaintiff, which, however, specifically excepted the Olive Pearl Ritter claim and applied only to claims which plaintiff had paid. These three claims have not been paid, and we are clear that neither the answer nor the stipulation admit the value of these particular shipments. The applicable section of the Iowa Code appears to be Section 11202, which provides that, "An allegation of value, or amount of damage, shall not be held true by a failure to controvert it." Yoe & Co. v. Nichols, 51 Iowa 330, 1 N.W. 664; Reilly v. Ringland, 39 Iowa 106. No action on account, as provided for in Section 11204 of the Iowa Code, was here involved. Lyman v. Bechtel, 55 Iowa 437, 7 N.W. 673.

Without determining whether or not the assignments of error as to the admissibility of this evidence consisting of exhibits have been waived, it clearly appears that the defendant has not waived the question as to whether or not there is any valid evidence in the record to support the finding, and without these incompetent hearsay exhibits, there is no evidence as to the value of these particular shipments. The value of these shipments, amounting in the aggregate to $553.16, should therefore not have been included in the judgment.

It is finally contended that the property destroyed was not within the coverage of the policy while it was at the Des Moines terminal, and that the court erred in reforming the policy so as to cover such goods. The policy as originally written covered liability for goods in transit in depots, wharves, or landing sheds, and the legal liability as carrier, bailee, or warehouseman under tariff or bill of lading, and on transportation operations. On December 19, 1935, an endorsement was added to the policy, which recited that in consideration of additional annual premiums, as listed, the policy was extended to cover liability not exceeding $5,000, in two terminals, one in New York City and the other in Fort Dodge. This was amended to include the terminal in Chicago, Illinois and the terminal in Des Moines, Iowa. These endorsements provide that all other terms and conditions of the policy remain unchanged. Later, plaintiff decided that it did not need this additional insurance at Chicago or Des Moines, and such coverage was cancelled. The cancellation was in form broad enough to include liability at the Chicago terminal and at the Des Moines terminal. This endorsement was dated December 30, 1935. Plaintiff therefore asked reformation of the original policy so as to leave it unimpaired. There was substantial evidence that the $5,000 additional insurance was to be taken without any change in the terms of the original policy. The court granted reformation as prayed, and found as a fact that the defendant did not intend that the endorsements referred to should impair or cancel any insurance afforded by the original policy, and that the insurance was to be the same after the endorsements as before. It seems clear that the original policy and its endorsements were intended to and did cover the liability of the plaintiff as a carrier for the loss of goods while in its possession as carrier, which would include the use of any terminal or warehouse facilities as a carrier. If the endorsements referred to were added either under the mistaken idea that the original policy did not cover such loss, or were issued as additional insurance, in either event plaintiff was entitled to recover under the original policy, and the reforma-

tion was proper, or at least not prejudicial. No part of the premium charges for the policy as originally written were returned, and the only provision which was intended to be affected by the endorsements was the additional or extended coverage granted thereby. The court, we think, correctly concluded that these endorsements did not impair or cancel the insurance as originally written.

The judgment appealed from should be modified by eliminating therefrom the sum of $232.32, on account of the three shipments not proven to have been in the custody of the insured at the time of the fire, and the sum of $553.16, being the aggregate amount of the Ritter, Harris Company, and General Electric Company shipments, on which there was no competent proof of value, and as so modified the judgment is affirmed. As to the shipments so eliminated, amounting in the aggregate to $758.48, the judgment is reversed and the cause remanded for new trial as to said shipments only. May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830; Massachusetts Bonding & Ins. Co. v. Thompson Co., 8 Cir., 88 F.2d 825.