L. M. CARTER, Appellant, v. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellee.

**Railways:** SHIPMENT OF LIVE STOCK: DELAY: CONNECTING CARRIERS.
1 A railway company receiving stock for shipment is not liable for the negligent delay of a connecting carrier, in the absence of a contract, partnership or traffic agreement which makes the two lines practically one.

**Same.** The acceptance of live stock by a railway company designated
2 for shipment to a point beyond the terminus of its line, creates a *prima facie* obligation to deliver the same at the point of destination.

**Same:** DELAY IN TRANSPORTATION: LIABILITY FOR DELAY OF CONNECTING
3 CARRIER. Where a railway company issues a bill of lading for the transportation of live stock to a destination beyond its own line, it becomes liable for a delivery at the point of destination and for the delay of a connecting carrier, unless there is some limitation of its liability in the bill of lading; but the mere fixing of a through rate will not justify the inference of a contract of through shipment, although such a contract may be upheld from all the circumstances.

**Same:** BILL OF LADING: CONSTRUCTION: THROUGH SHIPMENT: LIA-
4 BILITY OF INITIAL CARRIER: EVIDENCE. A bill of lading designating a shipment of stock to a certain city means, in the absence of usage, custom or agreement to the contrary, the terminal of the railway company's line in that city. In the instant case the evidence is held insufficient to show any agreement, partnership or

traffic arrangement between the initial carrier and the connecting line, which would render the initial carrier liable for damages growing out of the negligent delay of the connecting carrier; or to show any agreement of the initial carrier to deliver the shipment at a point beyond its own terminal.

*Appeal from Woodbury District Court.*—HON. DAVID MOULD, Judge.

SATURDAY, FEBRUARY 19, 1910.

ACTION to recover damages for defendant's delay in a shipment of live stock from Glen Ellen to the Sioux City Stockyards. Defendant denied all negligence, and in substance averred that, if there was any delay, it was on the part of a connecting carrier for whose negligence it was not responsible. The case was tried to a jury, and at the conclusion of the testimony the trial court directed a verdict for defendant, and plaintiff appeals.—*Affirmed.*

*W. G. Sears,* for appellant.

*Shull, Farnsworth & Sammis,* for appellee.

DEEMER, C. J.—Glen Ellen is a station on defendant's line of road something like eight miles from Sioux City. Defendant had no agent at that point, but received its orders for shipment therefrom either at Sioux City or some other station. Plaintiff was the owner of one hundred and four head of fat cattle which he desired to have shipped to Sioux City, and through his commission men notified the defendant's agent that he wished to make the shipment on defendant's regular train leaving Glen Ellen at half past seven a. m. on Monday morning, May 13th, for the early Sioux City market. The cattle were shipped pursuant to the order and arrived at defendant's yards in Sioux City, and were placed on the transfer tracks to be taken to the stockyards, at a quarter after eight

a. m. of the day of shipment.   When placed on this track the engineer of the train leaving them there gave the usual whistles to notify the stockyards switching company, or the Sioux City Terminal Railway Company that the stock was ready to be taken to the stockyards.   This transfer track was less than one-half mile from the stockyards, and it seems that the defendant, as well as all other companies entering Sioux City, had an agreement with the stockyards company to do the switching from the transfer track to the cattle chutes of the stockyards.   The stock remained on the transfer track for some little time, when they were taken to the chutes by the Terminal or Stockyards Company, and unloaded about eleven o'clock a. m.   The usual running time between Glen Ellen and the stockyards, according to some of the testimony, is from one hour to one hour and fifteen minutes.   Plaintiff claims that by reason of the delay he lost the advantage of the early market, and that by reason of the delay the cattle shrunk more than they would have done had they been delivered promptly.   No bill of lading was issued when the cattle were shipped, but after the receipt of the stock the company issued bills of lading to the commission house, the following being a copy of one so issued:

Chicago, Milwaukee & St. Paul Railway.
Live Stock Way-Bill.

W. B. No. 11.

Forwarded in Car No. 10071.   Initials C. M. & St. P.
Transfer into car
No.        Initials           at
No.        Initials           at
From Glen Ellen, Ia., to Sioux City, Ia., (S. C. & D. Div.)

Date, May 13, 1907.

This form of Way-Bill must in all cases be used in billing stock to Chicago, Milwaukee, Sioux Falls, Sioux City, Kansas City, Ottumwa, Cedar Rapids, Omaha, South Omaha, Council Bluffs, St. Paul, Minneapolis, Minnesota Transfer and La Crosse.   A separate Way-Bill should be

made for each car. Agents should be careful to see that the Stub (which should not be detached), is a correct copy of the Way-Bill. The total charges must always be entered in the proper place.

| Consignor. | Consignee. | Number and Description of Stock. |
|---|---|---|
| L. Carter. | McClusky, H & G. | Cattle. |
| Weight. | Rate. | Freight Charges. |
| 22,000 | 54 | 11.88 |

Full Names of Consignors and Consignees must be given on Way-Bill.

Plaintiff paid the freight on the stock as he said from Glen Ellen to the chutes at the stockyards to the Stockyards Company, and through his agents secured the following receipt:

Sioux City, Iowa, Station,
May 13, 1907.

S. C. & D. Div.

McClusky, Hudson & G.

To Chicago, Milwaukee & St. Paul Ry. Co. Dr. For Freight from Glen Ellen.

[Here follow three lines in fine print providing for payment of trackage, if there is a delay of more than 24 hours.]

| Date of Waybill. | No. of Waybill. | No. of Car. | Description of Articles. | Weight. | Rate. | Our Charges. | Back Charges. | Total |
|---|---|---|---|---|---|---|---|---|
| May 13 | 11 | 10071 | Cattle | 22000 | 5.4 | 11 88 | | |
| 13 | 12 | 1553 | " | 24200 | | 13 07 | | |
| 13 | 13 | 10773 | " | 23500 | | 12 69 | | |
| 13 | 14 | 8885 | " | 23700 | | 12 80 | | |
| 13 | 15 | 12787 | " | 22400 | | 12 10 | | |
| 13 | 16 | 89045 | " | 22000 | | 11 88 | | |
| | | | | | | 74 42 | | |

Consignor.          Received Payment.

L. Carter.      W. W. Brenckenridge, Agent.

The verdict was directed largely on the theory that there was no delay, and that if such were shown, defendant is not responsible therefor.   It is also argued that plaintiff failed to prove any damages which may be recovered in this form of action.   There is not a great deal of conflict in the testimony, but different inferences are sought to be drawn therefrom, and there is some dispute regarding the law.   The Sioux City Stockyards Switching Company, or the Sioux City Terminal Company is an independent company, owning its own tracks and doing the switching of cars for the different railways entering Sioux City from what were known as the transfer tracks to the chutes at the stockyards.   This company charged a switching fee, but it was collected from the railway companies, or absorbed by them.   When the cattle were delivered at the chutes, the Stockyards Company collected freight, if it had not been prepaid, from the commission men representing the shipper, and turned the amount over to the railway company over whose line the same originated, and, as we have said, the initial carrier paid the switching company for the switching.   There is no showing of any delay on the part of the defendant in taking the cattle to the transfer tracks; and, although defendant's testimony shows that there was no delay on the part of the switching company, there was testimony on the part of the plaintiff from which a negligent delay might have been found.   There was also testimony tending to show a shrinkage in the cattle due to the delay; and, as the weights upon arrival at the chutes were given, the amount of this shrinkage might have been ascertained.   There is some conflict in the testimony at this point, but there was enough to take the case to the jury on this issue.   That a better price could have been obtained for the cattle had they arrived earlier in the day might also have been found from the testimony.

The debatable, and in fact the only troublesome, ques-

tion in the case is the liability, if any, of the defendant for the delay of the switching company. The general rules with reference to such cases are pretty well established. It is well settled that a common carrier is not liable for the negligence of a connecting carrier in the absence of contract, express or implied. The initial carrier is regarded simply as a forwarding agent, and is not, in the absence of contract, liable for the default of a subsequent carrier. *Beard v. Railroad,* 79 Iowa, 527; *Mulligan v. Railroad,* 36 Iowa, 181; *Cobb v. Railroad,* 38 Iowa, 601. Some exceptions to the rule are recognized by the authorities, as for example, when there is a partnership arrangement, or such a traffic agreement as makes the two lines practically one. See *Cincinnati, H. & D. R. R. v. Pontius,* 19 Ohio St. 221 (2 Am. Rep. 391); *Peterson v. R. R. Co.,* 80 Iowa, 92.

*1. Railway: shipment of live stock: delay: connecting carriers.*

According to the rule announced by this court the acceptance of goods by a carrier marked to a point beyond the terminal of its line creates a *prima facie* liability to deliver at the point of destination. See *Mulligan* case, *supra; Angle v. R. R. Co.,* 9 Iowa, 487; *Beard v. R. R. Co., supra.* This is also the rule in England, although contrary to the great weight of authority in this country. In order to hold the defendant in this case responsible for the delay, it must be shown that there was such an arrangement between it and the switching company as made the two lines practically one, or that defendant accepted the goods for shipment, not to the terminus of its line, but the chutes at the stockyards. Even if the latter be shown, it must also appear that the contract did not limit liability to matters happening on defendant's own line. The writer would be glad to adopt the rule announced by the great weight of authority in this country, and to hold that from the mere receipt of goods marked to a destination beyond the initial carrier's

*2. Same.*

line no presumption arises of a contract to deliver at the
point of destination, and that in such cases the initial car-
rier has done its duty if it makes safe and timely delivery
to the connecting carrier.   That this is the general rule,
see cases cited in 6 Cyc. 479, 480.   We have, however,
treated the whole matter as one of presumption, and recog-
nized the right of the initial carrier to limit its liability
in such cases, either by contract or by usage.   *Hartley v.
R. R. Co.,* 115 Iowa, 613; *Mulligan v. Railroad, supra;*
*Hewett v. Railroad,* 63 Iowa, 611.

Again it is quite generally held that, if a carrier issues
a bill of lading or shipping receipt for the transportation
of goods to a destination beyond its own line, it binds
itself to deliver at the point of destination,
and is liable for the delays of a connecting
carrier, unless there be some limitation of
liability in the bill of lading or receipt.   See
cases cited in 6 Cyc. 481.   Of course a
contract for through transportation may be found from
the circumstances surrounding the shipment; and, in the
absence of express contract, this is generally a question of
fact for a jury.   *Phila. R. R. v. Ramsey,* 89 Pa. 474;
*Page v. Railroad,* 7 S. D. 297 (64 N. W. 137); *Mich.
R. R. v. Myrick,* 107 U. S. 102 (1 Sup. Ct. 425, 27 L.
Ed. 325).   But the mere fixing of a through rate will not
justify the inference of a contract for a through shipment.
*Hill v. Railroad,* 60 Iowa, 196; *Hill Co. v. Boston & L.
R. Corp.,* 104 Mass. 122 (6 Am. Rep. 202); *St. Louis
Co. v. R. R. Co.,* 104 U. S. 146 (26 L. Ed. 679).   There
is no claim that defendant did or neglected to do any-
thing on its part with reference to the shipment which
would make it liable.   Its liability must be predicated
upon what the switching company did, or neglected to do.
With these rules in mind we can go to the testimony
offered by plaintiff in support of its claim that defendant
is liable for the negligence of the switching company.

3. SAME: delay in transportation: liability for delay of connecting carrier.

We have set forth the only bills of lading issued by the defendant company, and these show that the destination of the property was Sioux City, Iowa. In the absence of usage or custom to the contrary this means, of course, the terminal of defendant's line in Sioux City. The receipt shows nothing to the contrary, although the parol testimony offered in connection therewith shows that this was the entire charge for delivery to the chutes at the stockyards. But neither the fixing of a through rate, nor the collection thereof, indicates in itself a contract for a through shipment. Plaintiff said in his testimony that he shipped his cattle over defendant's line from Glen Ellen to Sioux City, but that the business was done through his commission men. He also stated that he paid the freight at the stockyards to the defendant, taking the receipt heretofore quoted. He said that the freight paid by him covered the transportation from Glen Ellen to the stockyards chutes. He further testified as follows:

*4. SAME: bill of lading: construction: through shipment: liability of initial carrier: evidence.*

I understood that the transfer company took the cattle, after their arrival at the railroad yards in Sioux City, and my knowledge from hearsay was that the stock was handled by a transfer company. Q. Did you know, also, from hearsay that the railroad company itself did not deliver directly to the stockyards? A. Yes, sir. In May, 1907, I was generally familiar with the situation at the Sioux City Stockyards with reference to switching and to switching facilities, but did not know as an absolute fact that the Sioux City Terminal Railway Company or the Sioux City Stockyards did this switching. At that time I did not know whether the defendant railroad company had a switching track to the stockyards or not. I knew they switched the cars to the yards, but did not know they were independent. I knew that another engineer and crew took charge of the switching, but did not know to whom it belonged. I knew from hearsay that the railway company did not deliver directly to the stockyards. I never heard any claim that the shipper paid the Terminal Company to

do this shipping, but always heard that the party shipping
the stock paid the freight charges to the different railroad
companies, and the railroad company settled for the ship-
ping.   The defendant never made any claim for shipping
charges against me.   The tracks of the Terminal Company
do not extend outside of Sioux City.   The defendant never
made any claim to me that they would deliver the stock
on a side track.

Another witness for plaintiff testified as follows:

I have raised stock and shipped the same from Glen
Ellen, Iowa, to Sioux City and to the stockyards.   In
making such shipment we pay freight on eight miles, and
we pay to the railroad company only.   I have shipped over
the Milwaukee road from Glen Ellen to Sioux City fat
cattle on an average of three to four times a year.

The member of the commission firm, who made the
arrangements for the shipment of the cattle, and who paid
the freight, testified as follows:

I telephoned to the train dispatcher, or some other
officer, and asked him to put the cars from Glen Ellen in
for the Monday morning market.   This was on the pre-
vious Friday or Saturday.   Heretofore they had come
down there with a switch engine and brought them up, but
he said the regular train would pick them up that morn-
ing, if on time.   There was nothing said about turning the
cars over to the Terminal Company.   May 13, 1907, was
Monday.   I paid the freight and got the receipt, marked
"Exhibit A," from the Milwaukee Railway Company, and
handed it to Mr. Carter.   The freight charges on the cattle
were $74.42.   The Milwaukee Company has offices in the
Exchange Building at the stockyards, and the freight was
paid in this office.   There was no terminal or switching
charges. . . . I did not understand that there was any
arrangement to turn these cattle over to the Terminal Com-
pany, and I did not know that they would come into the
yards from the transfer tracks by the Terminal Company.
They were all switched in by the Stockyards Company.
VOL. 146 IA.—14.

The Stockyards Company is an independent concern from the Milwaukee Railway Company, but I do not know what their connection is. At the time I ordered the cars I knew the Stockyards Company took the cars from the transfer track to the yards, but we always ordered cars from the railroad company. When we order cars from the railroad company, we know, with the knowledge of the custom in practice, that they are switched from the defendant company's line by the Stockyards Company. . . . In regard to the custom by the Terminal Company and the railway company, will say that we deal direct with the railway company. I do not know whether there is a terminal charge in Sioux City or not. In Chicago they are putting a terminal charge on their account sales. We have no transaction with anything except the railway company, from whom we order the cars. We pay the freight in the first instance to the Stockyards Company. The Stockyards Company turns it over to the Milwaukee Company. The Milwaukee Company has an agent and a freight office in the Exchange Building. We did not order the cars through any soliciting agent, but took it up with Mr. Beardsley, the defendant's superintendent. Q. If there is a terminal railway company, that is the company that handles the stock? A. Yes, sir; but it is the Stockyards Company. Q. Is it operated by the Stockyards Company? A. Yes, sir. Q. An independent concern from the Milwaukee Railroad Company? A. Yes, sir. Q. You know stock coming in over the defendant railroad company's tracks is taken from their yards by this transfer company? A. Yes, sir; Stockyards Company, I call it. Q. And that is what you had in mind when you ordered the cars? A. I did. Q. You knew, as a matter of custom for years, that the Stockyards Company, or some company, handled these cars from the defendant company? A. Yes, sir. Q. You knew that when you ordered these cars? A. Yes, sir. Q. You knew that was the custom? A. Yes, sir. Q. When you order cars from the defendant line, you do so with the knowledge of the custom and practice that these cars are switched from the defendant company's lines to the stockyards by the Stockyards Company? A. Yes, sir. Q. And that has been the custom for a number of years? A. Yes, sir. Q. All the time? A. Yes, sir. Q. And you

paid the freight charges on this stock to the Stockyards Company? A. Yes, sir. The weights of these cattle were taken at the stockyards track scales, and that is the basis upon which the freight charges were made. They were taken to the Stockyards Company, and as the Stockyards Company brings them to the yards they take them over the scales and weigh them.

The defendant's testimony from various .witnesses on this point was as follows: Daniel Williams testified:

In May, 1907, I was assistant yard master for the Stockyards Company. The Sioux City Stockyards Company handle stock by loading and unloading the same. They operate a transfer company, but not a railroad company, and own all their own engines, and switch stock that comes in from different railroads, including the defendant's road. I think the transfer track is about half a mile from the chutes. . . . Our stockyards company is called the Sioux City Terminal Company, and is not connected with the defendant company. I have worked for the Stockyards Company for nine years, and the custom has been to leave cars loaded with stock for the stockyards at this transfer track. Q. What is the fact as to whether or not the Milwaukee Company, defendant, makes any delivery of stock to the stockyards proper? A. They don't, unless it would happen to be a case where an engine breaks down. Q. That would be by special arrangement? A. Yes, sir; it would. Do you know what the fact is as to whether or not the Stockyards Company will allow any other company to do any switching business, unless it is under unusual circumstances? A. No, sir; they don't allow it. I don't know who pays .for the switching. I do° not work under the orders of the shippers. When we hear the whistle, we go up and get the cars.

The conductor of defendant's train, which took the stock, testified:

On our arrival at the stockyards we cut off our engine, and a switch engine is supposed to get them and set them over to the stockyards on a transfer track, which

track is called No. 12. This track is about a block from
the stockyards transfer track. . . . The Milwaukee
switch engine comes along and leaves the stock car on our
track, called No. 12, and then the stockyards people come
and get it and go down to the stockyards with it.

Defendant's engine foreman testified as follows:

We took the stock up from the defendant's track No.
12, which is an incoming track for trains from the east,
and where stock is generally set over for transfer. We
put our switch engine on these cars at 8:30 in the morn-
ing, and from No. 12 we put them on what is known as
the stockyards lead. This took five or six minutes.
. . . Then we gave the usual signal, three blasts of
the whistle, the same as all railroads do, to notify the
Stockyards Company that the stock is on the track. . . .
When we whistle we stop right in front of the stockyards
transfer office. This whistle is an agreement between the
railroads and the Stockyards Company to let them know
that the stock is on the transfer. . . . These cars
were left on Track No. 12, as we always leave stock cars.

The president and general manager of the Stockyards
Company testified as follows:

I am familiar with the moving and custom of deliver-
ing stock to the yards by the various railroads that enter
in Sioux City. The manner of handling stock at the
stockyards is as follows: The stock arrives in the yard
of the defendant company. The trains are broken up, ca-
boose taken off, cars inspected to see if they are in proper
condition, then the switch engine of the roads take hold of
the train of stock, switch it to the tracks called transfer
tracks, which are on First Street, then they are left with
another engine of the Stockyards Company to take the cars
to the chutes of the Stockyards Company. In case of the
Milwaukee Company stock is not switched over the trans-
fer track, because the tracks are not large enough, so an
arrangement has been in force for years so that the Mil-
waukee Company put the stock upon one of their own
tracks right next to these First Street tracks, and the

stockyards engine comes into the Milwaukee yards after the stock. The so-called stockyards tracks or transfer tracks are joint tracks owned by five different railroads, and these joint tracks are leased to the stockyards, and the balance of the tracks are owned by the Stockyards Company. The operation and ownership is independent of the defendant, the Milwaukee Railroad Company. This practice has prevailed about seventeen years and is certainly known by the commission men, and, I think, by McClusky, Hudson & Breenameyer in May, 1907. Now we have a terminal company independent of the Stockyards Company, but in May, 1907, we did not. The Stockyards Company at that time owned the tracks from the stockyards and packing house out to these joint tracks I speak of, and operate these joint tracks to a point on First Street, where all delivery of stock was made to the Stockyards Company. Some years ago tracks were put in on First Street for the accommodation of the stockyards and packing house, which were located somewhat different than now, and were bought by the different railroads in 1890. They were operated by these companies, and then they arranged with the Stockyards Company to do the switching, and after that the loads to the yards and the packing houses went over these tracks, which are now owned by the Stockyards Company. The railroads owned the different tracks which did the switching, but afterwards we built out to the tracks and extended them a little further, and then we made arrangements with these different companies to do the switching, and for a while we used their tracks entirely. Afterwards the stockyards built tracks connecting with these joint tracks, and in May, 1907, in switching from the Milwaukee transfer we would run over a little less than half a mile of their tracks, and would use part of these tracks to get on our tracks. We then had a switching charge to the different railroad companies. We have no switching charge against the shippers. In this Carter case we charged a switching charge to the defendant. Q. You charged to any railroad company that delivered stock to you? A. Yes, sir. Q. That is more an arrangement than a custom? A. Yes, sir; it is an agreement. Q. This agreement you think has been changed from time to time, I suppose, in some particular? A. Agreement as regards

switching? Q. Yes. A. Yes; we have changed it some. After the Carter cattle were unloaded we delivered the car back to the defendant's tracks. The Stockyards Company collects freight on their stock sold at the yards, and turns it over to the different companies. Each railroad company has their clerks at the different offices in the Exchange to figure the freight, and the Stockyards Company simply collects it from the commission men. I understood that in May, 1907, the lease of the joint tracks with the different railroads had run out, and we were operating under promise of another. The Stockyards Company allowed no other company to do any switching to or from the yards. The Stockyards Company did all of the switching to all industries on its tracks.

This is the entire testimony in support of the proposition that under the rules hitherto stated defendant should be held liable for the delay of the Stockyards Company. In it we find no such showing of a traffic or partnership agreement between the Stockyards Company and the defendant as would make the defendant liable. The bill of lading issued by the defendant company fixed the destination of the property at Sioux City, and this, in the absence of proof to the contrary, meant the yards of the defendant company in Sioux City. Plaintiff said that he shipped the cattle to Sioux City, and that he paid the freight from Glen Ellen to the chutes at the stockyards. His agent who made the arrangements did not say that defendant agreed to deliver the stock at the chutes. He said he knew of the arrangements, and understood that the Stockyards or Terminal Company was to do the switching, and that it was the custom and usage of the switching or terminal company to take the cars at the transfer and take them to the chutes at the stockyards. He also said that he paid the freight to the Stockyards Company. It also appeared that the defendant company paid the switching charge or absorbed it in its freight rate. There is nothing here then to show a partnership arrangement or such

a joint undertaking as made each company liable for the default of the other under the rules above announced. Moreover, there is no showing of any undertaking, either express or implied, on the part of the defendant company to deliver the stock at the chutes. Plaintiff's agent knew the prevailing custom and usage, and knew that defendant did not undertake, on its own account, to make delivery at the stockyards. It is true that the Stockyards Company collected all the freight, and that the freight finally went to the defendant company, but this did not, in view of the testimony as to the usual and customary method of delivery, make the defendant liable. It merely undertook to and did pay the switching company its proportion of the charges. There is no testimony that the goods were either marked or billed to the stockyards, or that defendant undertook to carry them there. Its undertaking was to deliver to the switching company, and to pay the charge of that company. This did not make it liable for the default of that company. There was no testimony which would justify a finding against the defendant, and the trial court did not err in directing the verdict. None of the cases cited and relied upon by appellant run counter to the views herein expressed.

The judgment must be, and it is, *affirmed.*