CEDAR RAPIDS FUEL COMPANY, Appellee, v. ILLINOIS CENTRAL
RAILROAD COMPANY, Appellant.

**CARRIERS:** Carriage of Goods—Damage by Initial Carrier—Non-
1 liability of Terminal Carrier. A terminal carrier is not liable
for damage to an interstate shipment of goods when such damage
occurred wholly on the line of the initial carrier, unless such lia-
bility is assumed by some valid contract.

**CARRIERS:** General Freight Agent—Authority—Agreement to Pay
2 Damages. On the question of the implied authority of a general
freight agent of the carrier to bind the carrier by an agreement
to pay damages to goods, evidence reviewed, and held insufficient
to show such authority, or to show a waiver of the rules of the
carrier, expressly withholding said authority from the agent.

**CARRIERS:** General Freight Agent—Authority—Agreement to Pay
3 Damages. It is beyond the apparent scope of authority of a
general freight agent to promise, on behalf of the carrier, to pay
damages for which the carrier is not responsible.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

SATURDAY, DECEMBER 16, 1916.

ACTION to recover damages for injury to a carload of
charcoal, *en route* from Carters, Michigan, to Cedar Rapids,
Iowa, the same having been damaged by fire before it
reached defendant's line. The suit is bottomed on an alleged
agreement of defendant's agent at Cedar Rapids to pay the
claim. A jury was waived, and the cause tried to the court,
resulting in a judgment for plaintiff, and defendant appeals.
— *Reversed.*

*Grimm & Trewin* and *Helsell & Helsell,* for appellant.

*Tourtellot & Donnelly,* for appellee.

DEEMER, J.—A carload of charcoal was shipped by F. C.
Desmond, or the Desmond Charcoal and Chemical Company,

from Carters, Michigan, consigned to plaintiff, at Cedar

1. CARRIERS: carriage of goods: damage by initial carrier: nonliability of terminal carrier.

Rapids, Iowa. It was received by the Pere Marquette Railroad Company, the initial carrier, and routed over the Chicago & Northwestern Railway, from Manitowoc to a connecting point on the defendant line of road, and from that point to place of destination over defendant's railway. The fuel was purchased by plaintiff from the consignor, f. o. b. Cedar Rapids. It was stipulated on the trial:

"That when the said Pere Marquette car arrived at Manitowoc, Wisconsin, on July 27, 1912, the car was discovered on fire in the center of the car, and which fire practically destroyed the body of the car; that, after the fire had been put out and the contents allowed to cool off, the contents were reloaded into C. & N. W. car No. 72548, and forwarded from Manitowoc to Cedar Rapids through way bill No. 839, on July 28, 1912, arriving in Cedar Rapids on August 8, 1912, as per original way bill, which is hereto attached, the said car arriving in Cedar Rapids over the Illinois Central railroad; that all of the damage to said shipment occurred before it reached the line of the Illinois Central Railroad Company, and from causes over which it had no control. It is further agreed that the Illinois Central Railroad Company received said charcoal at its station at Freeport, Illinois, same having been shipped from Carters, Michigan, over the Pere Marquette Railroad, via the Chicago & Northwestern Railway at Manitowoc, Wisconsin, for transportation to Cedar Rapids, Iowa, and that said shipment was made under the terms and conditions of a certain bill of lading, a true copy of which is attached hereto, marked Exhibit 'A,' and made a part of defendant's answer in this case."

The amount of the damages to the car was also stipulated. At the outset, it is to be noticed that defendant was the terminal carrier; that the damages happened on the line of the initial carrier; and that defendant was in no manner responsible for the damages done to the goods. In these

circumstances, there was no liability on the part of the terminal carrier. What is known as the "Carmack Amendment" imposes liability for goods damaged or destroyed upon the initial carrier, no matter where the loss occurs. Other carriers *en route* are not primarily liable unless the damage occurs on their line, and, as no part of the damage occurred on defendant's line of road, it is not responsible, unless, as contended by appellee, plaintiff herein, defendant company legally obligated itself to pay the damages. *Kansas City S. R. Co. v. Carl*, 227 U. S. 639; *Carter v. Chicago, M. & St. P. R. Co.*, 146 Iowa 201; *Elliott v. Chicago, M. & St. P. R. Co.* (S. D.), 150 N. W. 777; *Charleston & W. C. R. Co. v. Varnville*, 35 Sup. Ct. Rep. 715; *Cincinnati, N. O. & T. P. R. Co. v. Rankin*, 36 Sup. Ct. Rep. 555; *Georgia, F. & A. R. Co. v. Blish Milling Co.*, 36 Sup. Ct. Rep. 541.

Recognizing this, plaintiff relies upon an agreement made by it with an agent of the defendant company, whereby it is claimed that the said agent, in consideration of plaintiff's accepting the goods and saving all of it that it could, promised and agreed, for and on behalf of his company, that said company would reimburse plaintiff for its loss. There is ample testimony of such an agreement, made by plaintiff with one Kerr, who was then defendant's local freight agent at Cedar Rapids; and the question which lies at the threshold of this inquiry is: Had the agent any authority from his company to make the agreement?

2. CARRIERS: general freight agent: authority: agreement to pay damages.

It appears that this agent had general charge of defendant's freight business in Cedar Rapids. But his authority was expressly limited by the following rules of the company:

"General freight department rules of the Illinois Central Railroad Company.

"Instructions regarding claims. Payment of claims not to be promised.

"Rule 197. Agents are not authorized to promise payment of any claims by these companies. Agents must not

allow claimants to see investigation papers or exhibition reports unless authorized to do so by the freight claim agents. Claims to be referred to freight claim agent.

"Rule 198. All claims that follow drafts must be referred to the freight claim agent before payment, accompanied by the original bill of lading or shipping receipt and original freight bills."

These rules, with others, were kept by the agent upon or near his desk, and it does not appear that they were ever changed, modified or waived, save it is shown that, on many occasions when damages were claimed for injury to or loss of goods, the claimants, by direction of this agent, made out their claims and presented them to him, and they were forwarded to the company, and paid or rejected by it, as circumstances seemed to warrant. The exact agreement made by this agent, according to the testimony, was as follows:

"Mr. Kerr told me to go ahead and get what salvage I could out of the car—present my claim to him—that he would O. K. it and I would get the money from the railroad company."

There was also some other testimony regarding an agreement made by plaintiff with one Hepperly, who, it seems, was Kerr's chief clerk in the freight house. This testimony is as follows:

"Finding that the same (damages) would reach a large figure, I again rang up Mr. Kerr on the phone and advised him. I said, 'I can't go any further towards salvaging this shipment,'—that the expense would be great, and I feared the railroad company—that the Illinois Central Railroad Company—would refuse to pay the claim. Mr. Kerr was out of the city at the time, but his chief clerk wired him my message and received the reply, instructing— Q. Was this reply communicated to you? (Objected to by the defendant for the same reasons stated in the objection last above. The objection overruled and the defendant excepts.) A. It was.

Q. By whom? A. By Mr. Hepperly. Q. What did he say to you? (Objected to by defendant for the same reasons as stated in the last objection. Objection overruled. Defendant excepts.) A. Instructed me to go ahead with the salvage of this shipment, as long as I had started it, and that the railroad company would pay the claim. Q. That is, your claim for damages? (Same objection, same ruling. Defendant excepts.) A. Yes, sir. I paid for this carload of coal a long time after I received it from the railroad company. I paid the freight to the Illinois Central Railroad Company possibly a week after I accepted and unloaded the car. I paid for the coal probably 30 or 40 days afterwards, under threat of a sight draft. Q. Now, had it not been for these promises that you had with Mr. Kerr and the chief clerk of the railroad company, would you have taken the car? A. I wouldn't.''

This witness also testified as follows:

''Since Mr. Kerr has been freight agent of the defendant company, I have dealt with him in regard to freight shipments. There was no other agent of the defendant company in Cedar Rapids, except their commercial traveling agent, who listed my business and gave me information in regard to empties. I made arrangements in regard to shipping in and out of Cedar Rapids with Mr. Kerr, who had an office in Cedar Rapids. . . . In other transactions, Mr. Kerr never tried to keep me from filing my claim for damages to freight, but he always advised me to file my claim. I have made claims for damages that didn't get paid, claims for damages to freight. I know that every railroad company has a freight claim agent as an official of the railroad. I know that my claims go to the general agent finally. . . . The communication I got from Mr. Hepperly was a telephone message. There was no written communication. The telegram passing from someone to someone else was not directly to me . . . I made the claim to the railroad company immediately after I got the coal salvaged, a week or two after I took possession.''

From this record, it is clear that, at best, Hepperly, the chief clerk, had no greater authority than Kerr; and if Kerr had no authority to make such a promise as is here relied upon, Hepperly had none.

The case must turn, then, upon the authority of Kerr. Manifestly, he had no express authority to make any such promise. In fact, such power was expressly withheld. If authority be found, it must be implied, or the instructions to the agent must have been waived, and, notwithstanding the rules, the agent given authority to make such contract. This latter authority may be found from direct testimony, or may arise out of the conduct of the parties. We do not think there is sufficient testimony to show a waiver of the rules, or that there was any change made in the powers conferred upon the agent. Whilst this agent had many times directed claimants to make out their claims and present them to him, he never, at any time, undertook to pay them himself, or promise that his company would pay them. He simply acted as an agent for the forwarding of the claims, leaving the allowance or disapproval thereof to his principal, the railway company. This was the course of business, and both parties followed it in this case, save that plaintiff now claims that the agent expressly acknowledged the justice of the claim against his company, and promised to pay the same.

This last agreement was unlike any theretofore made by this agent, and it is not shown that defendant had any knowledge or notice thereof; so that there is nothing in the claim of waiver or of extension of authority, beyond that covered by his instructions from his principal. The only doubtful question in the case is whether or not the agreement was within the apparent scope of the agent's authority.

A railway company, of necessity, has a large number of agents and many departments of service. Local agents, as a rule, have special and limited authority, and can only act with reference to the work to be done by the department in which they are employed. Plaintiff testified that he knew

this, and was advised that the company had a freight claim agent, and that his claims had to go to the general agent finally. He, himself, became skeptical of Kerr's authority and undertook to confirm it; but the confirmation, if any, was by Kerr's chief clerk, who, as we have said, had no authority to speak for the company in this matter, and no greater authority than Kerr himself had to make such a contract as is here sued upon. In these circumstances, we are of opinion that Kerr had no authority, either express or implied, to make a contract binding his company to pay absolutely claims for damages made by a shipper, or to arrange with the shipper to take the goods, make what he could out of them, and to reimburse the shipper for any loss he might suffer. The question is not new to this court. See *Betts v. Chicago, B. & Q. R. Co.*, 150 Iowa 252; *McLagan v. Chicago & N. W. R. Co.*, 116 Iowa 183.

Moreover, it must be remembered that defendant was under no legal obligation whatever to pay for the damages done the goods while in the possession of the initial or connecting carrier. Subject to his rights of inspection, etc., plaintiff was bound to receive the goods. It did so as the consignee under the bill of lading issued by the initial carrier, and could not, at any time, be heard to say that the damage done the goods amounted to a conversion thereof by any of the connecting carriers. The defendant's agent was, therefore, promising to pay plaintiff's damage for which defendant was not responsible; and that this was beyond the scope of his authority must be apparent. It is suggested in argument, however, that plaintiff was not obliged to take the goods, and that it did so only because of the agent's promise to make good the loss. Now, while plaintiff might not, because of the nature of its contract with the consignor, be required to accept the goods, as they were to be delivered to it f. o. b. Cedar Rapids, it did accept them as such consignee, as it had a right to do, and chose to rely upon the promise of an agent

*3. CARRIERS: general freight agent: authority: agreement to pay damages.*

to pay damages for which his company was not liable. In such circumstances, we think the promise was not only beyond the scope of the agent's authority, but, if given effect, it would operate as a convenient cloak for the granting of rebates, thus perverting the very object of the Elkins Amendment to the Interstate Commerce Act. That there was no conversion of the goods, see *Parsons v. United States Express Co.,* 144 Iowa 745, 750; *Clark v. American Express Co.,* 130 Iowa 254; *Aultman E. & T. Co. v. Chicago, R. I. & P. R. Co.,* 143 Iowa 561. And as to construing the Elkins Interstate Commerce Act, see *Union Pac. R. Co. v. Goodridge,* 149 U. S. 680. And as to authority of local agents in general, see *Richmond v. Greeley,* 38 Iowa 666; *Wolf v. Davenport, I. & D. R. Co.,* 93 Iowa 218. *Chicago, M. & St. P. R. Co. v. Kelm* (Minn.), 141 N. W. 295, is clearly in point, and the principles there announced are governing here. The trial court was in error in holding the promise made by the agent Kerr binding upon the company, and the judgment must be, and it is,— *Reversed.*

EVANS, C. J., WEAVER and PRESTON, JJ., concur.