**OCEAN ACCIDENT & GUARANTEE COR-PORATION, Limited, v. PENICK & FORD, Limited, Inc.***

No. 11290.

Circuit Court of Appeals, Eighth Circuit.

Feb. 6, 1939.

As Amended March 22, 1939.

*Rehearing denied April 8, 1939; further rehearing denied April 18, 1939.

Leslie H. Vogel and Richard H. Merrick, both of Chicago, Ill. (Ralph F. Potter, of Chicago, Ill., on the brief), for appellant.

Owen N. Elliott, of Cedar Rapids, Iowa (V. C. Shuttleworth, of Cedar Rapids, Iowa, on the brief), for appellee.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a judgment entered against the Ocean Accident and Guarantee Corporation, Limited, defendant below, in favor of appellee Penick & Ford, Ltd., Incorporated, plaintiff below. We shall refer to the parties as they appeared below.

Plaintiff brought the action to recover upon a policy of machinery insurance issued by defendant, whereby it agreed to indemnify plaintiff against loss to certain specified machinery resulting from its ac-

cidental breakdown, as defined in the policy. It was alleged in plaintiff's petition that subsequent to the issuance of the policy, and on August 25, 1936, there was a breakdown of one of the generators covered by the policy.

The answer as amended denied all the allegations of the petition, except those alleging the issuance of the policy and the making of proof of loss, and alleged that the injury to the generator, if any, occurred while it was undergoing an insulation breakdown test and as a result of such test, and that any claim therefor was specifically excluded by the terms of the policy.

At the close of all the evidence, defendant moved for a directed verdict, which motion was denied, and the cause was submitted to the jury upon instructions to which certain exceptions are here urged. The jury having returned a verdict in favor of plaintiff for $17,327.30, judgment was entered thereon from which this appeal is prosecuted.

In seeking reversal, defendant contends: 1, that the court erred in denying its motion for a directed verdict because (1) there was no evidence of an accident within the meaning of the policy, and (2) there was no evidence of impairment of function because the claimed injury occurred while the generator was undergoing an insulation breakdown test; 2, that the court erred in admitting evidence of the cost of power purchased by plaintiff and in submitting plaintiff's claim therefor to the jury, for the reason that the use and occupancy endorsement did not cover such claim; 3, that counsel for plaintiff, in his closing argument to the jury, was guilty of prejudicial misconduct.

At all times pertinent to this action, plaintiff owned and operated a corn and sugar cane products refining plant at Cedar Rapids, Iowa. The policy in question was issued in April, 1934, and provided that defendant would indemnify plaintiff against loss resulting from accident to the machinery covered by the policy. The term "accident" was defined in the policy as "a sudden and accidental breaking, deforming, burning out or rupturing of the object or any part thereof, which manifests itself at the time of its occurrency by immediately preventing continued operation or by immediately impairing the functions of the object and which necessitates repair or replacement before its operation

can be resumed or its functions restored." The policy also provided that the defendant should not be liable for any loss resulting from "an accident to any object * * * while said object is undergoing experimentation or an insulation breakdown test, or is being repaired or dried out." The policy bore a use and occupancy endorsement, by which defendant agreed to pay the plaintiff a daily indemnity of $1,000.00 for each day of total prevention of business at its plant caused solely by an accident covered by the policy, and to pay a portion of the daily indemnity for partial prevention of business.

In connection with this character of insurance, defendant maintains a force of trained men who make periodical inspections of the plants insured, these inspections being made approximately every three months. On August 23, 1936, defendant's engineer-inspector Griffin, while making an inspection of plaintiff's machinery, found a ground in the rotor in the Number 1 generator at plaintiff's power plant. The rotor is the revolving member of the generator. It consists of a steel drum or cylinder in the outer edge of which are cut slots about an inch wide and about two inches deep, running lengthwise of the cylinder for its full length. In these slots are placed the copper conductor or strap which constitutes the winding of the rotor. In each slot are several turns of the copper strap making up what is called a coil. In this generator the copper coils contained in each slot were built up of about eighteen turns of the copper strap, each turn insulated from the other and all insulated from the slot in which they were placed. The rotor weighs 4200 pounds and revolves at a speed of 3600 revolutions per minute. The copper strap which constitutes the winding of the rotor is one long continuous strap coiled in one slot and then threaded back through an adjacent slot and so on around the cylinder of the rotor. Each coil, consisting of about eighteen turns of the strap, is secured in its slot by an iron wedge bar which is driven lengthwise into a groove at the top of the slot and holds the coil tightly in place. These wedge bars are pushed in from either end in assembling the rotor and can only be removed by withdrawing them from the slot lengthwise. The wedge bars protrude an inch or so at each end beyond the rotor cylinder. Over the protruding ends of these wedge bars is shrunk a retaining ring, sometimes called an edge

ring or shroud ring, which further holds the bars in place.

Griffin immediately reported what he had discovered to Mr. Woodford, who was in charge of the power plant for plaintiff. The chief operating engineer at the plant was absent at the time, and a Mr. Reitz, plaintiff's master mechanic, had general charge of all mechanical operations. He was not at the plant when the ground was discovered. Nothing was done with regard to the generator that day, but on the following day, August 24, 1936, it was started up and ran throughout the day with apparent regularity, except that it was running rough. Sometime during that day, while the generator was being operated, Reitz and others in plaintiff's employ, decided to shut it down and call in the General Electric Company, but it ran until seven o'clock Tuesday morning, August 25th. On Monday, while the generator was still running, defendant got in touch with the General Electric Company at Chicago, and requested that a man be sent out to look at the machine. In response to this request, a Mr. Erickson of the General Electric Company came to Cedar Rapids, arriving there Tuesday morning, after the generator had been shut down. The generator was then dismantled and the rotor taken out and placed on blocks on the floor of the power house. When it was removed from the generator and placed on the floor, it was inspected to ascertain if the weak spot in the insulation, which the megger test had indicated, could be located. At one end of the rotor, just where the copper strap came out of one of the slots on its way to thread back and go into another slot, there was a spot where the insulation was slightly grayish and discolored as though there had been heating there. There was also some indication of heating on the outer edge of the wedge bar at this point. After this preliminary examination, the rotor was subjected to a smoking out or insulation breakdown test. When such test is made upon a machine known to be grounded, as the generator in question was, the machine can not again be operated until repaired. This test disclosed smoke at the point at one end of the rotor where some discoloration had previously been observed.

At the termination of this test, the rotor was crated up for shipment to Chicago, where proper tools for removing the end rings were available. A day or two later, Reitz representing plaintiff, and Griffin and Lee representing defendant, made an inspection of the rotor at Chicago. The retaining ring or end ring of the rotor had been removed and the wedge bar driven out of the slot where the burning had taken place. There was a spot on the side of the wedge bar, an inch or two from the end of the bar, where some copper from the strap which rested just below the bar in the slot had fused to the bar. There was a rupture in the copper strap, and the two ends were fused to the steel rotor. The rotor was installed new in 1924 and would have a normal life of not exceeding thirty-five years. Defendant's last inspection of the rotor was made the week of June 30 to July 3, 1936, when it was passed as being in proper condition.

Plaintiff ordered the rotor completely rewound and that was the only practicable course of repair. Inquiry was made to ascertain if a rotor was available to replace the damaged one while the rewinding was being done, but none was to be had. The rewinding of the rotor at the General Electric shops required a long time, so that the rewound rotor was not shipped to Cedar Rapids until October 3, 1936. Its installation was not completed until October 6th following. During all this period from August 25 to October 6, plaintiff purchased current to replace the current normally provided by the generator from the Iowa Power & Light Company. In this action, plaintiff sought to recover the cost of repairs to the generator and the excess of cost of power purchased over the cost of production had the generator been in use.

Counsel for defendant state in their brief that the principal questions at the trial were: (1) Whether or not the occurrence in question constituted an accident within the meaning of the policy, and (2) whether or not the claim for the cost of power purchased was admissible in any event. It is the contention of defendant that there was no breaking of this strap and no fusing of the broken ends to the rotor; that there was defective insulation at the point in question and some of the current leaked from the strap to the rotor which caused the ground, but that this in no way manifested itself in any impairment of function of the generator; that when the smoke or breakdown test was applied that resulted in fusing the strap to the rotor; that the operation of the generator from Monday morning until

Tuesday morning, following the discovery of the ground, clearly demonstrated that there was no impairment of function of the generator. The argument is persuasive, but we think it is an argument on a question of fact, and hence, one that should have been addressed to the jury, as it doubtless was.

There was, we think, substantial evidence introduced by the plaintiff, tending to support its claim that before the smoke test was applied, there had occurred a breaking of the strap and a fusing of its ends to the rotor, and that this occurrence immediately caused some impairment of function. The testimony of Reitz can not be ignored in view of the verdict of the jury. It was to the effect that he observed the break and the fusing of the ends to the rotor and that vibrometer tests indicated an increase of vibration on Monday, August 24. This evidence, if believed by the jury, warranted a finding of an accidental breakdown. We examine the record on this question for the purpose of determining whether or not there was substantial evidence, and we must accept as true the evidence supporting plaintiff's cause of action, and it is entitled to such reasonable favorable inferences as may fairly be drawn therefrom. Pryor v. Strawn, 8 Cir., 73 F.2d 595; Columbian Nat. Life Ins. Co. v. Comfort, 8 Cir., 84 F.2d 291; Illinois Power & Light Corp. v. Hurley, 8 Cir., 49 F.2d 681. There is no evidence of physical facts or of scientific principle conclusively establishing that the separation of the strap and the fusing of the ends to the rotor must have taken place when the smoke test was applied. Whether the smoke test produced the injury was, we think, a question for the jury.

There was expert testimony based upon a hypothetical question, to the effect that the break in this strap would occur instantly. In determining the meaning of the term "accident", as used in this policy, the question is not what it might mean to a scientist or one skilled in the subject involved, but what it means to the average man. Lewis v. Ocean Acc. & Guarantee Corp., 224 N.Y. 18, 120 N.E. 56, 7 A.L.R. 1129; Massachusetts Bonding & Ins. Co. v. Thompson Co., 8 Cir., 88 F.2d 825. Unless some technical meaning was obviously intended, the words "accident" and "accidental" should be given the meaning they impart in common speech. Lickleider v. Iowa State Traveling Men's Ass'n, 184 Iowa 423, 166 N.W. 363, 168 N.W. 884, 3 A.L.R. 1295. The testimony of the expert witness Drabelle that the vibration shown by the testimony was not by design either of the maker of the machine or of the plaintiff and that it was not normal, expected or anticipated, but that it caused the break in the strap, is sufficient, we think, to show that there was an accident. City of Detroit Lakes v. Travelers Indemnity Co., 201 Minn. 26, 275 N.W. 371.

Defendant contends that there was no impairment of function. The policy provides that this impairment must manifest itself "by immediately impairing the function of the object," and must necessitate "repair or replacement before its functions are restored." Assuming, as we must, the existence of the break and that the break was accidental, the testimony conclusively shows that an impairment of function necessarily followed. There was, to be sure, until Tuesday normal production of electricity by the generator. "Function" is defined as "that mode of action or operation which is proper to any organ, faculty, office, structure, etc." (Webster's International Dictionary), and as "the kind of action or activity proper to a person or thing" (New Century Dictionary).

Reitz testified that he took a vibrometer reading Monday morning, and that the instrument indicated that the generator was going "rough". There was evidence that the action of the generator in producing current after the accident was not normal or proper. There was an unnatural detour in the flow of current from one end of the broken copper strap through a part of the rotor which was intended to be completely insulated from such current, and then back into the other end of the broken copper strap. Normally, the current would flow through the copper straps. There was, according to the testimony, a discontinuity "only partly restored which offered the chance of further breakage and was also grounded." The machine was mechanically unbalanced and electrically unbalanced. A machine running off balance creates a hazard of a further ground in the machine, due to the fact that it is unbalanced and vibrates and subjects the conductors, particularly in the revolv-

ing field or rotor of the machine, to an increased amount of vibration stress, which may result in the turns in the windings becoming shorted or grounded, and a further unbalancing. A tremendous mechanical vibration would result. The creation of grounds in the rotor can cause a machine to be unbalanced sufficiently to cause such severe vibration that it might result in the rupture of the discs in the steam end, the breaking off of bearing pedestals, and in other · ways creating hazards to persons in the vicinity of the machine. Experts testified that the function of the generator was impaired; that the flow of current through the iron core from an end of the copper wire to the other would not be normal functioning of the machine. Fox, ·an expert witness for defendant, said that the ground should be repaired at the earliest convenience "which would not disturb unduly the operations of the plant;" that there was a continuous hazard as long as the ground was left unrepaired. The parting of the strap, one witness said, was such as to require the immediate repair of the machine. Griffin, the inspector for defendant, told Reitz ·that the machine should go into the General Electric to be repaired.

We think plaintiff was not required to operate a defective mechanism that was a hazard to its employees. It· was not required to wait until the inevitable happened. The result of the separated strap was to produce a condition that was abnormal mechanically. The defendant's liability does not depend upon immediate discovery of the manifestation of impairment of function, but upon its manifestation by immediately impairing the functions of the object. We think there was substantial evidence supporting the jury's finding in this regard.

It is finally urged on this phase of the case that the court should have directed a verdict in favor of the defendant for the reason that the uncontroverted evidence showed that the claimed injury occurred while·the generator was undergoing an insulation breakdown test. Endorsement No. 6 provides that defendant should not be liable for loss from an accident while the object was undergoing an insulation breakdown test. But there was substantial evidence offered by plaintiff, tending to show that the accident had already occurred· before this test was made. The testimony of Reitz, Earl, Erickson and Woodford tended to show a separation, burning, rupturing,

or deforming of the generator before the test. Erickson testified that the only purpose of the test was to confirm his judgment as to the location of the trouble which had been determined before the test was made. Expert witnesses testified that the amount of current used in the smoke test would not have been sufficient to have fused or welded the copper strap in question. We are not concerned with the credibility of these witnesses, nor with the weight that should be given to their testimony. We conclude, therefore, that there was no error in denying defendant's motion for a directed verdict.

█ Over· objection, the court permitted the plaintiff to prove the cost of the power purchased by it from the Iowa Power & Light Company during the time the generator was out of commission.· The liability of the defendant must be predicated upon and limited by the terms of the policy. Millers' Mutual Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, 8 Cir., 94 F.2d 741. The action is to recover such indemnity as defendant by its policy has contracted to pay. The terms of the policy are therefore of the utmost importance.

█ Paragraph G of the use and occupancy endorsement is in the nature of a limitation of liability. It provides: "G. The Company shall not be liable for payment for any prevention of Business resulting from an accident caused by fire or by the use of water or other means to extinguish fire, nor for any prevention of Business resulting from fire outside of the object, following an accident. The Company shall not be liable for payment for any time during which Business would not or could not have been carried on if the accident had not occurred. The Company shall not be liable for payment for any prevention of Business resulting from the failure of the Assured to use due diligence and dispatch in the resumption of Business. The period of prevention shall not be limited by the date of the end of the policy period."

The use and occupancy clause insures against loss for total or partial prevention · of business and provides for no indemnity on any other contingency.

As to the limitation clause, plaintiff contends that such provision implies that defendant will pay plaintiff for such expense as it may incur in resuming business, but it contains no promise by defendant to pay plaintiff for any such expense, but makes

the contingency for liability certain in that no payment for prevention of business is to be due if plaintiff fails to take reasonable steps to resume operations.

Paragraph H of the same endorsement provides as follows: "H. The Company may take such means as will in the opinion of the Company permit the resumption of Business, in whole or in part, on the Premises or to supply the functions of the Premises in some other way, or the Company may require the Assured to take such means including the use of any surplus machinery, duplicate parts, equipment, supplies and surplus or reserve stock, which may be owned or controlled by the Assured, any extra expense so incurred at the written direction of the Company to be paid by the Company. The Company may require the Assured to use finished product owned or controlled by the Assured, or similar finished product that may be purchased elsewhere, to substitute for the Business prevented, any extra expense incurred in the use or purchase of said finished product at the written direction of the Company to be paid by the Company. All such expenses, whether incurred by the Company or by the Assured at the written direction of the Company, shall be a part of and not in addition to the Limit of Loss."

 This provision was for the protection of defendant, so that it might take means to accelerate the resumption of business. But there is no evidence that it ever requested plaintiff to take any steps of any kind. What plaintiff did in its purchase of power was done on its own initiative. At that time defendant had not denied liability and did not deny liability until October 6, when plaintiff first made claim. Since plaintiff acted before there was any denial of liability, the element of denial of liability is removed from the case. Thacher v. Aetna Accident & Liability Co., 8 Cir., 287 F. 484, 28 A.L.R. 1280. Defendant was liable only under the contingencies provided by its policy. Hartford Fire Ins. Co. v. Northern Trust Co., 127 Ill.App. 355. It was confessedly plaintiff's duty to resume business with expedition, yet it can not recover the cost of so doing unless the policy so provides. Hebner v. Palatine Ins. Co., 157 Ill. 144, 41 N.E. 627; Millers' Mutual Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, supra. As a condition of liability, Paragraph H provides for written direction from the defendant. As the parties have by their contract made it a condition to liability for extra expense, such as the cost of power, that it must have been procured at the written direction of the defendant, the court can not inquire into the materiality of such a condition. Banco De Sonora v. Bankers' Mutual Cas. Co., Iowa, 95 N.W. 232. Under the terms of this policy, the plaintiff was not obligated to incur this expense unless it had received written direction from the defendant so to do. The defendant gave no such directions. The language being clear and unambiguous, we are not permitted to resort to any rules of construction. This extra expense in procuring power was not incurred by plaintiff at the written direction of defendant.

 It is argued that plaintiff should be allowed to recover the cost of procuring this extra power on the theory that it was under obligation to minimize the damages. That rule has manifestly no application here. Unless the damages were of such character that plaintiff was entitled under its contract to recover from defendant, it was no concern of defendant whether the damages were minimized or not. In the final analysis, the question here to be resolved is what loss did the plaintiff suffer, which, under the terms of the policy, was recoverable. Unless this loss was recoverable, the question of minimizing the damages is quite foreign to the issue. In Hartford Fire Ins. Co. v. Northern Trust Co., supra, the court said: "The contingency insured against never happened. Hence at the time this suit was brought appellee had no cause of action upon the contract set forth in the declaration."

 Plaintiff contends that under the pleadings, the question of written direction was not before the court. This objection could not for the first time be urged in this court. It was apparently not urged below, and had it been, if there were any defects in the pleadings they could readily have been cured. The absence of written direction was destructive of plaintiff's cause of action. Plaintiff relied upon its contract, and under this contract there was no right of recovery because there had been no written direction from the defendant to incur the expense of purchasing this outside power. There was therefore a failure of proof and this defect was fatal to the right of recovery regardless of the pleadings. We think, however, that the issue was properly within the pleadings. We conclude that it was error to admit testimony of the cost of the power purchased by plaintiff, and that this item of damages should not have

been submitted to the jury by the court's instructions. The principal amount of this cost was $13,635.42, which, with interest to date of the judgment, was $14,658.08. The total of the judgment is $17,327.30.

 It is finally urged that counsel for plaintiff were guilty of such misconduct as to entitle defendant to a reversal. Some of the remarks were improper. Many of them were not called to the attention of the court, either when made or at the close of the argument to the jury. The trial court, whenever objection was interposed, properly ruled on the objection. If it could be said that the remarks were seriously prejudicial, the prejudice was removed by the court's ruling which constituted a rebuke to the attorney making the offending remark. There was no attack on the defendant. This court will set aside verdicts for misconduct of counsel when necessary to prevent a miscarriage of justice, even though no objections or rulings have been made below. But the power should be sparingly exercised and under the most unusual circumstances. London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325. Lack of objection during the trial is an indication that the party considers the argument not unfair, or that he is hoping to secure a reversal at the hands of the appellate court, when an objection and a ruling or admonition by the court, made at the time, would cure the error, if any. The determination of the extent of permissible comment rests primarily in the judicial discretion of the lower court. We do not believe that the remarks of counsel here urged as misconduct were of such gravity as to require a reversal, in view of the timely admonition of the lower court.

 We conclude that the judgment appealed from can not be sustained in toto because of the inclusion of damages for the excess of electric current. It is erroneous only in the amount of damages allowed, and the items for which plaintiff, under this decision, is not entitled to recover are clearly ascertainable. The judgment is therefore modified by eliminating therefrom, as of the date of its entry, the sum of $14,658.08, and as so modified it is affirmed. As to the item of damages so eliminated, the judgment is reversed and the cause remanded for a new trial as to said issue only. American Alliance Insurance Co. v. Brady Transfer & Storage Co., 8 Cir., 101 F.2d 144; May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830. As defendant has denied all liability under the policy, it is not the prevailing party on this appeal, and plaintiff is entitled to recover its costs.