In the Matter of the Construction of the Will of WILLIAM N. CROMWELL, Deceased.

Surrogate's Court, New York County, March 27, 1950.

*S. Pearce Browning, Jr.,* and *Charles S. Reilley* for John F. Dulles and others, as executors of William N. Cromwell, deceased, petitioners.

*Arad Riggs* for American Society for Russian Relief, Inc., respondent.

FRANKENTHALER, S. The executors have petitioned for a construction of testator's will and for a determination whether the American Society for Russian Relief, Inc. (known formerly as Russian War Relief, Inc.) is entitled to take the legacy provided therein. They challenge the right of the society to receive payment upon the ground that it had ceased to " function " prior to the death of the testator on July 19, 1948, and hence did not qualify for payment under the provisions of the will. The petitioners rely upon the following text in paragraph Eighth of the will: " Should any beneficiary named in this ARTICLE EIGHTH be disqualified or incompetent to receive the part or parts set opposite its name, or should not be in existence or be not functioning at the time of my decease, then and in such event, it is my specific will and absolute direction that the part or parts of such party or parties shall be distributed and disposed of by my Executors to such other party or parties named in this ARTICLE EIGHTH, and in such proportion, division and manner, as in their absolute judgment they may deem best."

The petitioners acknowledge that the society is still a corporate entity and concede that it has not been dissolved as the result of voluntary or involuntary proceedings instituted in accordance with the provisions of the Membership Corporations Law or other statute. The issue framed by the pleadings is narrowed by this concession. The court is called upon to decide the single question of whether the legatee was in fact functioning

within the meaning of the will at the time of the testator's death.

The meaning which the testator intended to ascribe to the word " functioning " can in part be gathered when read in context and in its position in the will in relation to the phrase " or should not be in existence " (*Robinson* v. *Martin*, 200 N. Y. 159, 164). Unless the testator is to be charged with having deliberately repeated himself, and the use of the conjunction " or " between the two groups of words suggests that that was not his purpose, then the qualifying phrase " be not functioning " was not intended by Mr. Cromwell to imply a state of nonexistence. It consequently becomes plain that the word " functioning " signified to the testator activity constituting performance of a specified operation.

The word itself has been defined in a number of cases and has been described as being both " elastic " and " indefinite " (*General Elec. Co.* v. *Yost Elec. Mfg. Co.*, 139 F. 568, 570). *Fleming* v. *Moberly Milk Products Co.* (160 F. 2d 259) contains an apt definition consonant with standard usage. The court there said (pp. 268–269) : " The contention that ' functioning ' means merely being in the business and has no quantitative or other additional meaning, fails in several respects. * * * ' Function ' means something more than mere being; it means a quantitative accomplishment. * * * If ' functioning * * * ' means merely being in that business, ' existence ' in that field would mean nothing additional or different. We think both expressions have meaning * * *. We also think that ' functioning ' includes elements of means, method and extent not included in mere ' existence '."

In *American Steel & Wire Co.* v. *Denning Wire & Fence Co.* (160 F. 108, affd. 169 F. 793), the court said at page 113, quoting from the Century Dictionary: " The most usual signification of the word ' function ' is ' the fulfillment or discharge of a set duty or requirement; exercise of a faculty; that power of acting in a specific way which appertains to a thing by virtue of its special constitution.' "

Again in *Ocean Accident & Guar. Corp.* v. *Penick & Ford* (101 F. 2d 493), it was stated at page 497 : " ' Function ' is defined as ' that mode of action or operation which is proper to any organ, faculty, office, structure, etc.' (Webster's International Dictionary) and as ' the kind of action or activity proper to a person or thing ' (New Century Dictionary)."

The court in its search for the testator's meaning must of necessity resort to popular or legal authorities of the sort cited (*Orth* v. *Haggerty,* 126 App. Div. 118; *Matter of Shulsky,* 120

Misc. 232; Davids on New York Law of Wills, § 468). It will be seen that common to all of them is a concept of the fluid character of the word " function " and general recognition of the fact that it is used to denote completion or, at the very least, substantial completion of a given task.

Against this background the question resolves itself into a test of whether the activities of the society at the time of Mr. Cromwell's death constituted the discharge of the set duties appropriate to its purposes as prescribed in its charter. This follows from the fact that the gift was made to Russian War Relief, Inc. " for its general uses and purposes " (Will, art. eighth, subd. [48]). The certificate of incorporation stated the organization's general purposes to be " To solicit and collect funds and contributions   *   *   *   and to administer, expend, contribute, use and otherwise dispose of the principal and income of the same exclusively in furnishing aid and assistance for relief of human suffering in the Union of Soviet Socialist Republics and in territory which may be under the jurisdiction of or occupied by the armed forces of the Union of Soviet Socialist Republics and for the relief and rehabilitation of war refugees from the Union of Soviet Socialist Republics or from the territory above described   *   *   *."

The case against the respondent rests in large part upon the testimony of officials of the society who were called as witnesses upon behalf of the petitioner. It was established by them beyond doubt that the magnitude of the operations of the society during the war years was far greater than its activities in 1948. As against collections of $11,000,000 in 1943, $22,000,000 in 1944 and $32,584,000 in 1945, a total of $35 in cash and $32,267.57 described as gifts in kind was received in 1948 but of the last named figure $27,171.57 represents shipments in which the society acted solely as the agent for the American Jewish Joint Distribution Committee, buying goods in the name of the latter with the committee paying the manufacturers directly. All of these shipments were under purchase orders executed in 1947 or earlier.

David Weingard, executive director of Russian War Relief, testified that up until the end of the year 1946 the society had maintained two offices in New York, one of them consisting of three floors at No. 5 Cedar Street, and a number of packing and sorting plants located in cities all over the country. Hundreds of persons were employed and " tens of thousands " volunteered their services. By January, 1948, all warehouses and office leases were terminated, not a single person remained on

the payroll and voluntary assistance had been wholly abandoned. Of the hundred or more local committees that had operated through the war years, not one was still in existence in 1948.

In 1948 the headquarters of the society, for which no telephone service was listed or maintained, were located in Mr. Weingard's personal offices where the current records were kept. Operating expenses which had averaged $120,000 a month in the years through 1946 were reduced to $63,506.54 for the year 1947 and to a net of $5,501 for the year 1948, the latter figure representing a gross fee of $6,000 paid to Mr. Weingard from which prior credits of $499 were deducted. Mr. Weingard himself was no longer a salaried employee. All solicitation of funds ceased in 1946, the license issued to the society by the Advisory Committee on Voluntary Foreign Aid of the United States Government was revoked in 1948 and no statements were filed with the committee for the quarter ending March 31, 1948. Among the most significant factors in the entire situation was the failure of the executive committee to hold any formal meeting in 1947 or 1948 and the fact that several of the directors were of the belief that the society had been dissolved, as testified to by Mr. Peter Grimm, a member of the board.

There were introduced in evidence two letters to which considerable significance attaches for the light they cast upon the picture of discontinuance of activities. The first of these in point of time was dated May 31, 1946, and was sent by Edward C. Carter, the society's president, to the chairman and treasurers of all Russian Relief Committees. He stated " To-day I am able to give you the decision of the National Board to conclude Russian Relief's public activities at the end of 1946." The second, dated December 10, 1948, contains an express admission on the part of the society's officers that it could not qualify for the legacy under Mr. Cromwell's will. Its withdrawal by a subsequent letter dated December 14, 1948, in no way overcomes the acknowledgment that the activities of the society for all practical purposes had come to an end.

As against this body of proof, the respondent points to the fact that as of July 19, 1948, the society had assets consisting of cash on deposit in banks in excess of $59,000. This, however, was simply a balance remaining on hand of funds set aside " for administrative, shipping and liquidation expenses from December 1, 1946, until the close of the Society's activities " and, according to the testimony of the treasurer, Mr. Grimm, it was regarded as a reserve " for the settlement of certain claims that are outstanding and law suits pending."

The respondent also contends that evidence of its continuing activities is to be found in the fact that fifty shipments of goods were made to Russia in 1948, the last in July of that year. The purchase orders for the goods included in all but seven of these shipments were dated prior to 1948 and of these seven, six bore no dates at all and only one of them represented a purchase made directly by the society out of funds described as earmarked contributions. That purchase dated February 2, 1948, amounted to $1,113 for medical supplies sent to a medical institute and to a doctor in Moscow. The other six consisted of four contributions of clothing sent in by the Brethren Service Centre and two by Church World Service amounting in all to twenty-eight bales. The Brethren Service Centre gifts represented the final work done as a sewing project by its members in fashioning clothing from materials furnished by the society in 1946 and 1947. On the basis of this proof in contrast with the vast volume and value of contributions shipped to Russia totaling over $54,000,000 up to June 27, 1945, alone, it could hardly be said that the society was operating in 1948.

It is plain that the respondent has failed to sustain the burden of establishing its right to qualify for payment of the legacy, with the result that the executors have become empowered to select another beneficiary as the recipient of the bequest. This conclusion has been reached without reference to the testimony of General Smith or Dr. Mosely or to record evidence offered to show that conditions in Russia would not permit the accomplishment of the purpose for which the society was established. The motion to strike out that testimony and evidence is granted, the court holding on the basis of the balance of the proof that the society was not " functioning " within the meaning of the will at the time of the testator's death.

Submit decree on notice construing the will accordingly.